Harold F. RICE, Plaintiff–Appellant,

v.

Benjamin J. CAYETANO, Governor of the State of Hawai'i; Mazie K. Hirono, Lieutenant Governor of the State of Hawai'i, Defendants–Appellees.

No. 97–16095.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 5, 1998.

Decided June 22, 1998.

John W. Goemans, Kamuela, Hawaii, for plaintiff-appellant.

Dorothy D. Sellers, Deputy Attorney General, Honolulu, Hawaii, for defendants-appellees.

Before JAMES R. BROWNING, BRUNETTI and RYMER, Circuit Judges.

RYMER, Circuit Judge.

Hawaii holds special elections for trustees of the Office of Hawaiian Affairs (OHA), who must be Hawaiian and who administer public trust funds set aside for the betterment of "native Hawaiians" and "Hawaiians," in which only people who meet the blood quantum requirement for "native Hawaiian" or "Hawaiian" may vote.[1] There is a long history behind the use and structure of the public lands trust for the benefit of descendants of the original races inhabiting the Hawaiian

Islands, none of which is challenged in this appeal. Rather, we must decide only whether Hawaii may limit those who vote in special trustee elections to those for whose benefit the trust was established.

Harold F. Rice, who is caucasian and not a beneficiary of the trusts administered by OHA's trustees, appeals the district court's summary judgment in favor of Benjamin J. Cayetano, Governor of Hawaii, upholding the voter qualification in a published opinion.[2] *Rice v. Cayetano*, 963 F.Supp. 1547 (D.Haw.1997). We agree that the franchise for choosing trustees in special elections may be limited to Hawaiians, because Hawaiians are the only group with a stake in the trust and the funds that OHA trustees administer. They have the right to vote as such, not just because they are Hawaiian. For this reason, neither the Fifteenth Amendment nor the Equal Protection Clause precludes Hawaii from restricting the voting for trustees to Hawaiians and excluding all others. Therefore, as we have jurisdiction under 28 U.S.C. § 1291, we affirm.[3]

I

A

Some history is helpful by way of background.[4]

---

1. "Hawaiian" means "any descendant of the aboriginal peoples inhabiting the Hawaiian Islands which exercised sovereignty and subsisted in the Hawaiian Islands in 1778, and which peoples thereafter have continued to reside in Hawaii," and "native Hawaiian" means "any descendant of not less than one-half part of the races inhabiting the Hawaiian Islands previous to 1778, as defined by the Hawaiian Homes Commission Act, 1920, as amended; provided that the term identically refers to the descendants of such blood quantum of such aboriginal peoples which exercised sovereignty and subsisted in the Hawaiian Islands in 1778 and which peoples thereafter continued to reside in Hawaii." Haw.Rev. Stat. § 10–2.

2. A brief in support of the state's position was submitted by amici curiae Office of Hawaiian Affairs, State Council of Hawaiian Homestead Associations, Kamehameha Schools/Bishop Estate, Na Pua A Ke Alii Pauahi, Inc., Association of Hawaiian Civic Clubs, Council of Hawaiian Organizations, Native Hawaiian Bar Association, Native Hawaiian Legal Corporation, Native Hawaiian Advisory Council, Ha Hawaii, Hui Kalai'aina, and Alu Like, Inc.

3. Although neither party addresses standing, it is a threshold question that we must consider even if not raised in the district court or on appeal. *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 230–31, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990); *McMichael v. County of Napa*, 709 F.2d 1268, 1269 (9th Cir.1983). While Rice may have only a generalized interest in the affairs of OHA and its trustees, he appears to be an adequately injured party as a caucasian resident of Hawaii who allegedly is denied the right to vote on racial grounds in a statewide election. *See, e.g., Baker v. Carr*, 369 U.S. 186, 206–08, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) (asserted injury to fundamental right to vote deemed a sufficient personal stake to support standing).

4. We realize that the historical facts are not without controversy or complexity. We can't begin to set them all out, nor can we even be sure that every fact we recite is not misleading without further explanation. However, this appeal does not turn on any single historical fact, and our intention is simply to recite enough history to give context to the dispute that we do have to decide.

Hawaii was an independent kingdom from 1810 until 1893 when it was overthrown and replaced by a provisional government (the Republic of Hawaii) that sought annexation to the United States. The United States accepted the cession of sovereignty of Hawaii in the Annexation Act of 1898. 30 Stat. 750 (1898). As a result, roughly 1,800,000 acres of crown, government, and public lands were ceded to the United States. The Annexation Act provided, however, that all revenues from the public lands were to "be used solely for the benefit of the inhabitants of the Hawaiian Islands for educational and other public purposes." *Id.* The Organic Act, passed in 1900, established the Territory of Hawaii and confirmed that the public lands ceded to the United States would remain in the possession of the government of the Territory for public works and other public purposes. Organic Act § 91, 31 Stat. 141 (1900), *reprinted in,* 1 Haw.Rev.Stat. at 84 (1993).

In 1920, the Hawaiian Homes Commission Act (HHCA), 42 Stat. 108 (1921), *reprinted in,* 1 Haw.Rev.Stat. at 191 (1993), set aside some 200,000 acres of public lands as "available lands" for nominal price leases to "native Hawaiians." HHCA § 203. The term "native Hawaiian" was defined to mean "any descendent of not less than one-half part of the blood of the races inhabiting the Hawaiian Islands previous to 1778." HHCA § 201(7). HHCA responded to the fact that the number of full-blooded Hawaiians was decreasing and that the Hawaiian race required rehabilitation by being returned to the land. H.R.Rep. No. 839, 66th Cong., 2nd Sess. at 4 (1920). Accordingly, it specified

that the trust was to be administered on behalf of the native Hawaiian beneficiaries of the Act. HHCA § 101(c).

Hawaii was admitted to the union as a state in 1959. Admission Act of March 18, 1959, Pub.L. No. 86–3, 73 Stat. 4, *reprinted in,* 1 Haw.Rev.Stat. at 90 (1993). In connection with admission, Hawaii agreed as a compact with the United States to adopt the HHCA, including its definition of native Hawaiians, as part of the state Constitution. Admission Act § 4. Article XII, § 1 of the Hawaii Constitution accomplished this. Further, the Admission Act provided that public lands held by the United States that were granted or conveyed to Hawaii pursuant to § 5(b) were to be held by Hawaii as a public trust for five purposes, one of which is "the betterment of the conditions of native Hawaiians." [5] Admission Act § 5(f). The other four purposes pertain to the public generally. [6]

As it happens, no benefits actually went to native Hawaiians until the state constitution was amended in 1978 to establish the Office of Hawaiian Affairs. OHA was created to hold title to § 5(b) property (except for HHCA "available lands," which are separately administered by the Department of Hawaiian Home Lands) in trust and manage it for native Hawaiians and Hawaiians. [7] Haw. Const. art. XII, § 5. OHA administers for native Hawaiians a pro rata share (now twenty per cent) of the public lands trust that was created under § 5(f) of the Admission Act. [8] *See* Haw. Con. art. XII, §§ 4, 6; Haw.Rev. Stat. §§ 10–3(1), 10–13.5. It also administers

---

**5.** Section 5(f) provides that the lands granted to the State of Hawaii by the Admission Act, together with proceeds and income,

> shall be held by said State as a public trust for the support of the public schools and other public educational institutions, for the betterment of the conditions of native Hawaiians, as defined in the Hawaiian Homes Commission Act, 1920, as amended, for the development of farm and home ownership on as widespread a basis as possible for the making of public improvements, and for the provision of lands for public use.

Admission Act, § 5(f).

**6.** In accordance with the Admission Act, the Hawaii Constitution declared that "[t]he lands granted to the State of Hawaii by Section 5(b) of the Admission Act ... excluding therefrom lands

defined as 'available lands' by ... the [HHCA] ... shall be held by the State as a public trust for native Hawaiians and the general public." Haw. Const. art. XII, § 4.

**7.** The purposes of OHA are the betterment of conditions of native Hawaiians and Hawaiians, serving as the principal agency responsible for the performance, development, and coordination of programs for native Hawaiians and Hawaiians, assessing policies of other agencies impacting on native Hawaiians and Hawaiians, and applying for, receiving, and disbursing grants for native Hawaiian and Hawaiian programs and services. Haw.Rev.Stat. § 10–3.

**8.** The other four purposes for the § 5(f) trust have no allocated pro rata percentage, nor is the remaining revenue administered by OHA.

appropriated funds for Hawaiians. Haw. Rev.Stat. § 10–3(2). Pursuant to the constitution and statutes enacted to implement it, OHA is governed by a board of trustees whose members must be Hawaiian and who are elected in special elections by qualified voters who are Hawaiian. Haw.Rev.Stat. §§ 13D–1, 13D–2, 13D–3(b)(1), 13D–4.

## B

Rice was born and has always lived in Hawaii. While he traces his ancestry to two members of the legislature of the Kingdom of Hawaii, prior to the Revolution of 1893, Rice is caucasian and is not within the statutory definition of Hawaiian or native Hawaiian. *See* Haw.Rev.Stat. § 10–2.

In March 1996, Rice applied to vote in the August 1996 election for trustees of OHA. The registration form contained the following declaration: "I am also Hawaiian and desire to register to vote in OHA elections." Rice crossed off the phrase "am also Hawaiian and" and marked "yes" on the application. He is otherwise a qualified voter, but his application was denied since he is not Hawaiian.

Rice brought this action pursuant to 42 U.S.C. § 1983 challenging his exclusion from voting for OHA trustees on the grounds that conditioning eligibility on being Hawaiian violates the Voting Rights Act of 1965 as amended (42 U.S.C. §§ 1971 *et seq.*),[9] 42 U.S.C. § 1981, and the Fourteenth and Fifteenth Amendments of the United States Constitution. The district court concluded that the method of electing OHA trustees meets constitutional standards for the essential reason that the restriction on the right to vote is not based upon race, but upon a recognition of the unique status of native Hawaiians that bears a rational connection to Hawaii's trust obligations. In any event, the court noted, OHA performs no truly governmental functions and "is carefully constrained by its overall purpose to work for the betterment of Hawaiians." 963 F.Supp. at 1558. Having already disposed of other claims, the court entered summary judgment. Rice timely appealed.

## II

Rice complains about the "extraordinary" authority and discretion that OHA, which is a state agency, is given to provide government services to a segment of the population defined exclusively by race, funded by a twenty percent share of revenues from the public lands trust which may lawfully be applied for the benefit of all people of the state without regard to race, and run by trustees who are voted into office by an electorate apportioned on a purely racial basis. He submits that the racial restriction on the right to vote violates the Fifteenth Amendment because it conditions the right to vote in statewide elections for trustees on membership in the Hawaiian race. It violates the Fourteenth Amendment, according to Rice, because this classification by race, and the corresponding racial restriction on the franchise, fails the test of strict scrutiny which must be applied to all distinctions based on race under *Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995). And, he contends for the first time on appeal, it also violates the anti-nobility prohibitions of the United States Constitution because it establishes immutable classes among citizens, giving some greater entitlement to political power than others, based solely on birth and ancestry.

Hawaii, on the other hand, emphasizes that neither the definition of native Hawaiians or Hawaiians, nor the designation of specific public lands for their benefit, nor OHA, nor its purposes, is at issue. That being so, it contends, the limitation of the right to vote for OHA trustees to Hawaiians and native Hawaiians is not a racial classification, but a legal one based on who are beneficiaries of the trusts in a special purpose, disproportionate impact election of the sort described in *Salyer Land Co. v. Tulare Lake Basin Water Storage Dist.,* 410 U.S. 719, 93 S.Ct. 1224, 35 L.Ed.2d 659 (1973). In any event, Hawaii points out, it did not intentionally discriminate on the basis of race because the genesis of the whole structure was Congress's requirement that the new state of Hawaii accept the definition of native Hawaiian in the HHCA and accede to the purposes of the

---

9. Rice has abandoned his claims under the Voting Rights Act and § 1981.

§ 5(f) trust which include, in part, betterment of the conditions of native Hawaiians. Finally, the state submits, its classification survives rational basis review (which is the appropriate standard) under *Morton v. Mancari,* 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974), because the federal government and the state of Hawaii have the same special relationship with and owe the same unique obligation to native Hawaiians as the federal government does to Indian tribes.

Rice counters Hawaii's argument that the right to vote merely reflects the legal status of native Hawaiians and Hawaiians by pointing out that the legal status of being a beneficiary of the OHA trusts is based only on race. That may be so, but the constitutionality of the racial classification that underlies the trusts and OHA is not challenged in this case.[10] This means that we must accept the trusts and their administrative structure as we find them, and assume that both are lawful.[11]

If, as we must, we take it as given that lands were properly set aside in trust for native Hawaiians; that the State properly established an Office of Hawaiian Affairs to hold title to, and manage, property set aside in trust or appropriated exclusively for native Hawaiians and Hawaiians; and that OHA is properly governed by a board of trustees whose members are Hawaiian, it follows that the state may rationally conclude that Hawaiians, being the group to whom trust obligations run and to whom OHA trustees owe a duty of loyalty,[12] should be the group to decide who the trustees ought to be. Put another way, the voting restriction is not primarily racial, but legal or political. Thus, we conclude that Rice's argument fails under both the Fourteenth and Fifteenth Amendments for essentially the same reasons.

### A

■ Specifically with respect to the Fifteenth Amendment,[13] Rice maintains that Hawaii has created a racially pure voting bloc which states cannot do for any reason under *Gomillion v. Lightfoot,* 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960). Moreover, he points out, the Fifteenth Amendment is self-executing and absolute on its face. Since the voter qualification is expressly racial, and absolutely denies the right to vote to all races except the Hawaiian race, Rice contends that it violates the plain meaning of the Fifteenth Amendment without need for further inquiry. *Shaw v. Reno,* 509 U.S. 630, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993).

Rice is, of course, quite right that the Hawaii Constitution and Haw.Rev.Stat. § 13D–3 contain a racial classification on their face. The Hawaii Constitution provides in Article XII, section 5: "There shall be a board of trustees for the Office of Hawaiian Affairs elected by qualified voters who are Hawaiians, as provided by law." And § 13D–3, implementing it, provides that: "No person shall be eligible to register as a voter for the election of board members unless the person meets the following qualifications: (1) The person is Hawaiian." Haw. Rev.Stat. § 13D–3(b).

■ Yet restricting voter eligibility to Hawaiians cannot be understood without refer-

---

**10.** In this connection, we note that the scholarly work upon which Rice relies—and others that we have read—focuses on the underlying arrangement and its constitutionality, not on the voting rights provision at issue here. *See* Stuart M. Benjamin, *Equal Protection and the Special Relationship,* 106 Yale L.J. 537 (1996); *see also* Jon Van Dyke, *The Constitutionality of the Office of Hawaiian Affairs,* 7 U. Haw. L.Rev. 63 (1985).

**11.** We express no opinion on the constitutionality of the underlying trust structure, or of OHA's purposes, because we are not called upon to determine the constitutionality of any of the racial classifications in the HHCA or the Admission Act or the Hawaii Constitution or the statutes establishing OHA—except for the one provision in Article XII, Section 5 of the Constitution and

Haw.Rev.Stat. § 13D–3, limiting the right to vote for OHA trustees, that are directly challenged here.

**12.** Haw.Rev.Stat. § 10–16(c), for example, provides that "[i]n matters of misapplication of funds and resources in breach of fiduciary duty, board members shall be subject to suit brought by any beneficiary of the public trust entrusted upon the office."

**13.** The Fifteenth Amendment provides: "The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." U.S. Const. amend. XV, § 1.

ence to what the vote is for. As the district court explained in detail, 963 F.Supp. at 1556–57, the vote is for the limited purpose of electing trustees who have no general governmental powers and perform no general governmental purposes.[14] The voting restriction itself applies only at a special election to elect members of the OHA board;[15] in general elections, all persons generally qualified to vote may vote. In these respects the trustee elections are like the special purpose elections upheld in *Salyer Land Co. v. Tulare Water Dist.*, 410 U.S. 719, 93 S.Ct. 1224, 35 L.Ed.2d 659 (1973) and *Ball v. James*, 451 U.S. 355, 101 S.Ct. 1811, 68 L.Ed.2d 150 (1981). In both cases, the system for electing directors of special purpose water districts limited voting eligibility to landowners on a proportional basis, excluding others in the district. The Court concluded that by virtue of their limited purpose, including the districts' lack of normal governmental authority, and the disproportionate effect of their activities on landowners as a group, the districts' electoral scheme comported with the Fourteenth Amendment and did not run afoul of the popular election requirements set out in *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). Thus, elections may be held for special purposes and voter qualifications that might otherwise be invalid may survive when they limit eligible voters to those who are disproportionately affected and the government agency does not perform fundamentally governmental functions.

Rice nevertheless asks us to dismiss the *Salyer* rationale entirely on account of OHA's authority over funds that include a twenty percent share of revenues from the ceded lands trust; the similarity between what OHA does for its beneficiaries and what the state otherwise does generally for all citizens without regard to race; and the fact that OHA activities are of vital concern to all citizens of Hawaii. But we cannot set *Salyer* aside altogether, for Rice's points reflect frustration with OHA—which is something we can do nothing about in this case. Whether or not the frustration—or OHA—is justified, the fact remains that public lands and funds have long since been committed in trust, and continue to be allocated in part, for the purpose of benefiting the Hawaiian peoples; they are the only peoples legally interested in how those funds are handled; and for them to decide who should administer the trust does not seem exceptionable under *Salyer* except for the fact, which we recognize, that the qualification has to do with race instead of ownership of land, as in *Salyer*. For this reason we do not regard *Salyer* as dispositive, but we cannot say that it has no applicability whatever.

■ Nor may we ignore the reality that the voting restriction for trustees is rooted in historical concern for the Hawaiian race, going back at least to the Hawaiian Homes Commission Act of 1920, carried through statehood when Hawaii acknowledged a trust obligation toward native Hawaiians as a condition of admission to the union, and on to 1993, when Congress passed a Joint Resolution "apologiz[ing] to Native Hawaiians on behalf of the people of the United States for the overthrow of the Kingdom of Hawaii on January 17, 1893 with the participation of agents and citizens of the United States, and the deprivation of the rights of Native Ha-

---

14. OHA trustees have power to manage proceeds and income from whatever source for native Hawaiians and Hawaiians, including § 5(f) revenue; to exercise control over property set aside to OHA for native Hawaiians and Hawaiians; to handle money and property on behalf of OHA; to formulate policy relating to the affairs of native Hawaiians and Hawaiians; to provide grants for pilot projects; and to make available technical and financial assistance and advisory services for native Hawaiian and Hawaiian programs. Haw. Rev.Stat. § 10–5. The duties of the board are similarly channeled. They are to develop a master plan for native Hawaiians and Hawaiians; to assist in development of other agencies' plans for native Hawaiian and Hawaiian programs and

services; to maintain an inventory of, and act as clearinghouse for, programs for native Hawaiians and Hawaiians; to keep other agencies informed about native Hawaiian and Hawaiian programs; and to conduct research, develop models for programs, apply for and administer federal funds and promote the establishment of agencies to serve native Hawaiians and Hawaiians. Haw.Rev.Stat. § 10–6.

15. Section 13D–4 provides that "[m]embers of the board of trustees shall be elected at a special election held in conjunction with the general election in every even-numbered year." Haw. Rev.Stat. § 13D–4.

waiians to self-determination." Pub.L. 103–150, 107 Stat. 1510 (1993). In this sense, the special treatment of Hawaiians and native Hawaiians reflected in establishment of trusts for their benefit, and the creation of OHA to administer them, is similar to the special treatment of Indians that the Supreme Court approved in *Morton v. Mancari*, 417 U.S. 535, 554, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974). As we said of *Mancari* in *Alaska Chapter, Associated Gen. Contractors v. Pierce*, 694 F.2d 1162 (9th Cir.1982), preferential treatment that is grounded in the government's unique obligation toward Indians is a political rather than a racial classification, even though racial criteria may be used in defining eligibility. *Id.* at 1168 n. 10. While we recognize that *Mancari* is distinguishable because Hawaiians are not exactly like Indians (for example, they aren't organized in tribes and there isn't an Hawaiian Commerce Clause in the Constitution),[16] and we do not regard either *Mancari* or *Pierce* as controlling,[17] both indicate that we are not compelled to invalidate the voting restriction simply because it appears to be race-based without also considering the unique trust relationship that gave rise to it.

█ Accordingly, even though there is little authority to guide application of the Fifteenth Amendment in a case such as this, we are persuaded that no violation exists. The Fifteenth Amendment "squarely prohibits racially-based denials of the right to vote," Laurence H. Tribe, *American Constitutional Law*, at 335 n. 2 (2d ed.1988), and renders inoperative any provision of a state constitution that restricts the right to suffrage to members of a particular race, *see Neal v. Delaware*, 103 U.S. 370, 389, 26 L.Ed. 567 (1881), but this isn't a general election for government officials performing government functions of the sort that has previously triggered Fifteenth Amendment analysis. Fur-

ther, the voter qualification at issue here—albeit clearly racial on its face—does not exclude those who ever had, now have, or ever can have any interest in the outcome of the special election for trustees (at least not unless and until the whole trust scheme and administrative structure is invalidated). Under these circumstances, to permit only Hawaiians to vote in special elections for trustees of a trust that we must presume was lawfully established for their benefit does not deny non-Hawaiians the right to vote in any meaningful sense. The special election for trustees is not equivalent to a general election, and the vote is not for officials who will perform general governmental functions in either a representative or executive capacity. *Cf., e.g., Lane v. Wilson*, 307 U.S. 268, 59 S.Ct. 872, 83 L.Ed. 1281 (1939) (striking down, under the Fifteenth Amendment, procedural hurdles to registering to vote in general elections); *Smith v. Allwright*, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944) (state cannot set racial qualifications for primary because the right to vote in a primary is like the right to vote in a general election). Nor does the limitation in these circumstances suggest that voting eligibility was designed to exclude persons who would otherwise be interested in OHA's affairs. *Cf., e.g., Gomillion v. Lightfoot*, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (gerrymandering city boundary to deny a vote to African–Americans who lived in the city and otherwise would have had the right to vote in municipal elections, without any countervailing municipal function the scheme was designed to further). Rather, it reflects the fact that the trustees' fiduciary responsibilities run only to native Hawaiians and Hawaiians and "a board of trustees chosen from among those who are interested parties would be the best way to insure proper management and adherence to the needed fiduciary principles."[18] The

---

**16.** Rice makes the additional point that whatever the historic obligation may have been, it ran to "native Hawaiians" and not to persons of *any* Hawaiian ancestry as the OHA statute prescribes. Again, this may be so since the definition of beneficiaries was changed in the 1978 constitutional amendments to include "Hawaiians" as well as "native Hawaiians," but it is immaterial to this appeal because the underlying classification is not at issue.

**17.** Although we questioned *Mancari*'s continuing vitality in light of *Adarand* in *Williams v. Babbitt*, 115 F.3d 657, 663 (9th Cir.1997), and Rice believes *Adarand* trumps both, we are bound by Supreme Court authority and our own precedent until overruled, which neither *Mancari* nor *Pierce* has been.

**18.** 1 Proceedings of the Constitutional Convention of Hawaii of 1978, Standing Comm. Rep. No. 59 at 644. The Committee reporting on Section 5, establishing OHA, further noted that

challenged part of Hawaii law was not contrived to keep non-Hawaiians from voting in general, or in any respect pertinent to their legal interests. Therefore, we cannot say that Rice's right to vote has been denied or abridged in violation of the Fifteenth Amendment.

### B

■ Regardless, Rice argues, the racial restriction on the right to vote for OHA trustees violates the Fourteenth Amendment[19] even if the Fifteenth Amendment isn't applicable. *Shaw* indicates that racial classifications on the face of a statute are immediately suspect, he emphasizes, and the classification here cannot survive for lack of any compelling justification under *Adarand.*

We obviously agree that there is a racial classification on the face of § 13D–3, and that it is suspect as such; but we disagree for the reasons we have already explained that it is primarily racial in context. Nor is the eligibility requirement, strictly speaking, a preference of the sort that concerned the Court in *Adarand.* Instead, it is more like the limitation of voting to landowners in *Salyer.* We have no trouble understanding why Hawaii would want the people who have an interest in the trust to vote for trustees, and it is rational for the state to make this decision in light of its trust responsibilities for Hawaiians and native Hawaiians. *See Mancari,* 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290; *Pierce,* 694 F.2d 1162. However, even if the voting restriction must be subjected to strict judicial scrutiny because the classification is based explicitly on race, it survives because the restriction is rooted in the special trust relationship between Hawaii and descendants of aboriginal peoples who subsisted in the Islands in 1778 and still live there—which is not challenged in this appeal. Thus, the scheme for electing trustees ultimately responds to the state's compelling responsibility to honor the trust, and the

restriction on voter eligibility is precisely tailored to the perceived value that a board "chosen from among those who are interested parties would be the best way to insure proper management and adherence to the needed fiduciary principles." 1 Proceedings of the Constitutional Convention of Hawaii of 1978, Standing Comm. Rep. No. 59 at 644.

Given the fact that only Hawaiians and native Hawaiians are trust beneficiaries, there is no race-neutral way to accord only those who have a legal interest in management of trust assets a say in electing trustees except to do so according to the statutory definition by blood quantum which makes the beneficiaries the same as the voters. We therefore conclude that because Hawaiians and native Hawaiians have the right to vote as such, not just because they are Hawaiian, that the Equal Protection Clause does not preclude Hawaii from restricting the voting for trustees to Hawaiians and excluding all others.

### III

We decline to consider Rice's argument that the restriction on voting to descendants of pre–1778 inhabitants violates the Anti–Nobility Clauses of the United States Constitution because the issue is raised for the first time on appeal. *United States v. Patrin,* 575 F.2d 708, 712 (9th Cir.1978).

AFFIRMED.

■

---

trustees should be so elected because "people to whom assets belong should have control over them.... The election of the board will enhance representative governance and decision-making accountability and, as a result, strengthen the fiduciary relationship between the board member, as trustee, and the native Hawaiian, as beneficiary." *Id.*

**19.** Section 1 of the Fourteenth Amendment provides:

No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.