Earl F. ARAKAKI, et al., Plaintiffs,

v.

Linda LINGLE in her official capacity as Governor of the State of Hawaii, et al., Defendants.

No. CIV.02–00139 SOM/KSC.

United States District Court, D. Hawai'i.

Jan. 14, 2004.

H. William Burgess, Honolulu, HI, for Plaintiffs.

Mark J. Bennett, Attorney General, argued, State of Hawaii, Honolulu, HI, for Linda Lingle, State Officials, Hawaiian Homes Commissioners.

Sherry P. Broder, argued, Honolulu, HI, for Trustees of the Office of Hawaiian Affairs.

## ORDER DISMISSING PLAINTIFFS' REMAINING EQUAL PROTECTION CLAIM

MOLLWAY, District Judge.

### I. INTRODUCTION.

This is the latest in a long line of motions filed in this case. The historical background set forth in earlier orders is incorporated herein. Plaintiffs' sole remaining claim is Plaintiffs' Equal Protection challenge as state taxpayers to programs being administered by Defendant Office of Hawaiian Affairs ("OHA").

OHA was established in 1978 by a state constitutional amendment. *See* Haw. Const. art. XII, §§ 5–6. The purposes of OHA include 1) bettering the condition of Hawaiians and native Hawaiians,[1] 2) serving as the principal state agency responsible for the performance, development, and coordination of programs and activities relating to Hawaiians and native Hawaiians; 3) assessing the policies and practices of other agencies affecting Hawaiians and native Hawaiians; 4) applying for, receiving, and disbursing grants and donations from all sources for Hawaiian and native Hawaiian programs and services; and 5) serving as a receptacle for reparations. Haw.Rev. Stat. § 10–3. It is undisputed that OHA administers programs for the benefit of all Hawaiians, not just native Hawaiians. It is also undisputed that OHA receives state tax appropriations. However, the extent of the taxes received by OHA and the exact nature of the programs benefitting Hawaiians have not been clearly established.

To the extent Plaintiffs are challenging OHA's use of state tax revenues to satisfy prerequisites for receiving matching feder-

---

[1] When referring to "Hawaiians" in this order, the court means any descendent of the aboriginal peoples inhabiting the Hawaiian Islands who exercised sovereignty and subsisted in the Hawaiian Islands prior to 1778. When referring to "native Hawaiians" in this order, the court means any descendant of not less than one-half part of the races inhabiting the Hawaiian Islands previous to 1778. To the extent Plaintiffs allege that OHA distributes funds solely to native Hawaiians, those claims have been dismissed.

al funds, Plaintiffs lack standing to bring that challenge. Any such challenge necessarily challenges federal laws, and Plaintiffs' state taxpayer standing does not include standing to challenge any federal law. Accordingly, that claim is dismissed.

That leaves Plaintiffs' challenge to OHA's use of state tax revenues for programs not subject to federal matching fund provisions. OHA argues that this remaining claim should be dismissed because it presents a nonjusticiable political question. The political status of Hawaiians is currently being debated in Congress, and this court will not intrude into that political process. Accordingly, Plaintiffs' remaining Equal Protection claim is dismissed.

## II. *STANDARD OF REVIEW.*

OHA's motion to dismiss is based on the political question doctrine. There is considerable debate about whether the political question doctrine is a jurisdictional or prudential limitation on this court. In *Hopson v. Kreps,* 622 F.2d 1375, 1378 (9th Cir.1980), the Ninth Circuit recognized this dispute:

> The government urges that the political question doctrine has prudential as well as Article III dimensions, and contends that its application involves a weighing of relevant considerations on a case-by-case basis. It asks us to sustain the decision of the district court on the basis of a finding that the court sensitively applied the well-known criteria enunciated in *Baker v. Carr,* 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962), to the particular facts before us. We need not resolve the longstanding debate as to the nature and proper scope of the political question doctrine.

*Id.* (footnote omitted).

Some cases have considered the political question doctrine as going to this court's jurisdiction.

In *Flast v. Cohen,* supra, 392 U.S. 83, 95, 88 S.Ct. 1942, 1949, 20 L.Ed.2d 947, the Court noted that the concept of justiciability, which expresses the jurisdictional limitations imposed upon federal courts by the 'case or controversy' requirement of Art. III, embodies both the standing and political question doctrines upon which petitioners in part rely. Each of these doctrines poses a distinct and separate limitation, *Powell v. McCormack,* 395 U.S. 486, 512, 89 S.Ct. 1944, 1959, 23 L.Ed.2d 491; *Baker v. Carr,* supra, 369 U.S. 186, 198, 82 S.Ct.691, 699, 7 L.Ed.2d 663, so that either the absence of standing or the presence of a political question suffices to prevent the power of the federal judiciary from being invoked by the complaining party.

*Schlesinger v. Reservists Comm. to Stop the War,* 418 U.S. 208, 215, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974); *accord Sierra Club v. Morton,* 405 U.S. 727, 732, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972) ("Congress may not confer jurisdiction on Art. III federal courts to render advisory opinions, or to entertain 'friendly' suits, or to resolve 'political questions,' because suits of this character are inconsistent with the judicial function under Art. III.") (internal quotations omitted); *Koohi v. United States,* 976 F.2d 1328, 1337 (9th Cir.1992) (Kleinfeld, J., concurring) ("Both [the] political question doctrine and sovereign immunity go to jurisdiction."); *Occidental of Umm al Qaywayn, Inc. v. A Certain Cargo of Petroleum Laden Aboard Tanker Dauntless Colocotronis,* 577 F.2d 1196, 1203 (5th Cir. 1978) ("Throughout the history of the federal judiciary, political questions have been held to be nonjusticiable and therefore not a 'case or controversy' as defined by Article III.").

The Supreme Court has also noted, however, that the political question "doctrine

has become a blend of constitutional requirements and policy considerations." *Flast v. Cohen*, 392 U.S. 83, 95–97, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). Accordingly, the Tenth Circuit has stated:

> Deeply rooted ambiguity in the nature and justification of the political question doctrine has prevented clear classification of the appropriate type of dismissal in political question cases. *See* Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction 2d § 3534.3, at 517–525 (2d ed.1984). We agree with Wright & Miller's conclusion that, in the end, clear classification is immaterial: "[T]here is probably more room for confusion than benefit in attempting to analogize [political question dismissal] to dismissal for failure to state a claim, or to dismissal for lack of jurisdiction. Some cases will be appropriate for dismissal on the pleadings, others will require further development ...." *Id.* at 525; cf. Daniel O. Bernstine, *The Political Question Doctrine: A Perspective on its Procedural Ramifications*, 31 U. Kan. L.Rev. 115, 129–30 (1982) (concluding that dismissal for subject matter jurisdiction is appropriate if the claims fall within an established category of political questions or are frivolous, but that, otherwise, dismissal for failure to state a claim is appropriate).

*Schroder v. Bush*, 263 F.3d 1169, 1171, n. 1 (10th Cir.2001), *cert. denied*, 534 U.S. 1083, 122 S.Ct. 817, 151 L.Ed.2d 700 (2002); *accord Brown v. Hansen*, 973 F.2d 1118, 1121 (3d Cir.1992) ("The political question doctrine does not deprive courts of jurisdiction over a case.").

 This court need not decide whether the present motion to dismiss based on the political question doctrine raises a jurisdic-

tional issue that should be resolved under Rule 12(b)(1) or merely prudential concerns that should be resolved under Rule 12(b)(6). On the present motion, the choice of rule does not affect the standard of review. Under either rule, this court, on the present motion, assumes the truth of Plaintiffs' factual allegations and determines whether, based on those allegations, the political question doctrine requires dismissal. *See Savage v. Glendale Union High Sch., Dist. No. 205, Maricopa County*, 343 F.3d 1036, 1039 n. 1 (9th Cir.2003) ("because this case was considered by the district court under a Rule 12(b)(1) motion to dismiss, we assume the material facts alleged in the complaint are true"); *Shaver v. Operating Engineers Local 428 Pension Trust Fund*, 332 F.3d 1198, 1203 (9th Cir. 2003) ("Since this is a 12(b)(6) motion, we assume that all the facts well pleaded in the complaint are true."); *Burke v. AT & T Tech. Servs. Co.*, 55 F.Supp.2d 432, 436 (E.D.Va.1999) (when examining "a motion to dismiss pursuant to Rule 12(b)(1), Fed. R.Civ.P., on the basis that the complaint, on its face, fails to state a basis for subject matter jurisdiction, the court assumes all facts in the complaint are true, thus providing the plaintiff with the same procedural protections as a Rule 12(b)(6) determination") (internal quotation omitted).

### III. *POLITICAL QUESTION ANALYSIS.*

#### A. *Overview of the Political Question Doctrine.*

 OHA argues that Plaintiffs' remaining Equal Protection claim challenging the provision of benefits to Hawaiians by OHA involves a nonjusticiable political question.[2] The political question doctrine

---

**2.** Plaintiffs' state taxpayer standing is insufficient to support a challenge to OHA's expenditure of funds as a prerequisite to receiving matching federal funds. Any such challenge would require this court to review the federal law governing the matching funds, which this

bars this court's review of controversies that "revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Assoc. v. Amer. Cetacean Soc.*, 478 U.S. 221, 230, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986). On these matters, this court is "ill suited to make such decisions, as 'courts are fundamentally underequipped to formulate national policies or develop standards for matters not legal in nature.'" *Id.* (quoting *United States ex rel Joseph v. Cannon*, 642 F.2d 1373, 1379 (1981)).

■ This court may dismiss an action on the ground that it involves a nonjusticiable political question when one of the following is "inextricable from the case":

[1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; [2] or a lack of judicially discoverable and manageable standards for resolving it; [3] or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; [4] or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; [5] or an unusual need for unquestioning adherence to a political decision already made; [6] or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker v. Carr*, 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). "Unless one of these formulations is inextricable from the case at bar, there should be no dismissal for non-justiciability on the ground of a political question's presence." *Id.* at 217, 82 S.Ct. 691; *United States v. Mandel*, 914 F.2d 1215, 1222 (9th Cir.1990) ("Implicating any one of these factors renders a question 'political' and thus nonjusticiable.").

■ Congress generally has been recognized as having plenary power to deal with the "special problems of Indians."[3] *Morton v. Mancari*, 417 U.S. 535, 552, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974); *accord South Dakota v. Yankton Sioux Tribe* 522 U.S. 329, 343, 118 S.Ct. 789, 139 L.Ed.2d 773 (1998) ("Congress possesses plenary power over Indian affairs, including the power to modify or eliminate tribal rights."); *see also* Art. I, Section 8, cl. 3 ("The Congress shall have Power ... To regulate

court cannot do based solely on state taxpayer standing. *See W. Mining Council v. Watt*, 643 F.2d 618, 631–32 (9th Cir.1981); *see also* Order Granting Defendants' Motions to Dismiss Plaintiffs' Claim Regarding the Hawaiian Home Lands Lease Program (Nov. 21, 2003) (filed in this action).

3. Congress has delegated at least some of its plenary power to legislate regarding federally recognized Indian tribes to the executive branch. 25 U.S.C. § 2 ("The Commissioner of Indian Affairs shall, under the direction of the Secretary of the Interior, and agreeably to such regulations as the President may prescribe, have the management of all Indian affairs and of all matters arising out of Indian relations."); 25 U.S.C. § 9 ("The President may prescribe such regulations as he may think fit for carrying into effect the various

provisions of any act relating to Indian affairs, and for the settlement of the accounts of Indian affairs."); 43 U.S.C. § 1457 ("The Secretary of the Interior is charged with the supervision of public business relating to the following subjects and agencies: ... 10. Indians.").

In 1978, the Department of the Interior promulgated regulations that govern the recognition of Indian tribes. *See* C.F.R. § 83.7. Hawaiians and native Hawaiians are not expressly recognized as Indians or Indian tribes under those regulations. *Id.; Kahawaiolaa v. Norton*, 222 F.Supp.2d 1213, 1219 (D.Haw. 2002) ("Congress has not yet decided that it will deal with Native Hawaiians [sic] groups as political entities on a government-to-government basis.").

Commerce with ... the Indian Tribes"). This plenary power to legislate regarding federally recognized Indian tribes is based on a "history of treaties and the assumption of a 'guardian-ward' status." *Morton*, 417 U.S. at 552, 94 S.Ct. 2474.

Historically, Congress viewed Indians as weak, dependent upon and needing the protection of the United States government.

These Indian tribes are the wards of the nation. They are communities dependent on the United States,—dependent largely for their daily food; dependent for their political rights. They owe no allegiance to the states, and receive from them no protection. Because of the local ill feeling, the people of the states where they are found are often their deadliest enemies. From their very weakness and helplessness, so largely due to the course of dealing of the federal government with them, and the treaties in which it has been promised, there arises the duty of protection, and with it the power. This has always been recognized by the executive, and by congress, and by this court, whenever the question has arisen.

. . . . .

The power of the general government over these remnants of a race once powerful, now weak and diminished in numbers, is [n]ecessary to their protection, as well as to the safety of those among whom they dwell. It must exist in that government, because it never has existed anywhere else; because the theater of its exercise is within the geographical limits of the United States; because it has never been denied; and because it alone can enforce its laws on all the tribes.

*United States v. Kagama*, 118 U.S. 375, 383–85, 6 S.Ct. 1109, 30 L.Ed. 228 (1886). In light of this paternalistic attitude, the Supreme Court has recognized that "Congress ... has a right to determine for itself when the guardianship which has been maintained over the Indian shall cease. It is for that body, and not the courts, to determine when the true interests of the Indian require his release from such condition of tutelage." *United States v. Sandoval*, 231 U.S. 28, 46, 34 S.Ct. 1, 58 L.Ed. 107 (1913) (quoting *Tiger v. W. Inv. Co.*, 221 U.S. 286, 315, 31 S.Ct. 578, 55 L.Ed. 738 (1911)).

Accordingly, the political question doctrine has been found to bar a myriad of claims pertaining to Indians. In *Board of County Commissioners of Creek County v. Seber*, 318 U.S. 705, 63 S.Ct. 920, 87 L.Ed. 1094 (1943), for example, the Supreme Court applied the political question doctrine to claims challenging a federal tax exemption for certain members of the Creek Tribe. *Id.* at 718, 63 S.Ct. 920 ("The fact that the Acts with-draw lands from the tax rolls and may possibly embarrass the finances of a state or one of its subdivisions is for the consideration of Congress, not the courts."). The political question doctrine has also been applied to claims by native American groups that they should be recognized by the federal government. *See Miami Nation of Indians of Indiana v. United States Dept. of the Interior*, 255 F.3d 342, 345–46 (7th Cir.2001); *see also Cherokee Nation of Okla. v. Babbitt*, 117 F.3d 1489, 1496 (D.C.Cir.1997) ("Whether a group constitutes a 'tribe' is a matter that is ordinarily committed to the discretion of Congress and the Executive Branch, and courts will defer to their judgment."); *W. Shoshone Bus. Council v. Babbitt*, 1 F.3d 1052, 1057 (10th Cir.1993) ("The judiciary has historically deferred to executive and legislative determinations of tribal recognition").

Indeed, the political question doctrine has been applied in this district to claims

by native Hawaiians challenging the Department of the Interior's regulations pertaining to federal recognition of Indian tribes. *Kahawaiolaa v. Norton*, 222 F.Supp.2d 1213, 1219 (D.Haw.2002) (Kay, J.) ("Adjudication of Plaintiffs' claims would directly place the Court in the shoes of Congress and the Executive Branch in determining whether Native Hawaiians should be recognized and acknowledged as an Indian tribe."), *on appeal, see* 2003 WL 22670058 (May 15, 2003) (Appellee's Brief).

■ Although the power Congress has over Indian affairs is plenary, it is not absolute. *See Delaware Tribal Bus. Comm. v. Weeks*, 430 U.S. 73, 84, 97 S.Ct. 911, 51 L.Ed.2d 173 (1977). Courts may scrutinize "Indian legislation to determine whether it violates the equal protection component of the Fifth Amendment."[4] *Id.* In *Morton*, 417 U.S. at 555–56, 94 S.Ct. 2474 (1974), after applying a rational basis test to a Due Process Clause challenge, the Supreme Court upheld a preference given to members of federally recognized Indian tribes in their employment with the Bureau of Indian Affairs.[5] However, the Court did not have before it any question as to whether the native Americans being given the preference were from federally recognized Indian tribes.

## B. Application of the Political Question Doctrine to This Action.

On a previous motion, this court ruled that OHA had not met its burden of establishing that Plaintiffs' Complaint presented a nonjusticiable political question that required its dismissal.

The gist of the claims in the Complaint is that the benefits provided by OHA and HHC/DHHL are race-based, that those benefits should therefore be analyzed under the Equal Protection Clause to see whether they pass "strict scrutiny,"[6] and that the benefits should be stopped because they are not "narrowly tailored to further a compelling governmental interest." *See Shaw v. Reno*, 509 U.S. 630, 643, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993). Plaintiffs argue that the restriction of benefits to Hawaiians and native Hawaiians is "presumptively invalid and can be upheld only upon an extraordinary justification." *See id.* at 643–44, 113 S.Ct. 2816.

Although most race-based preferences are subject to "strict scrutiny," preferences given to American Indian tribes

---

**4.** On December 22, 2003, the day that OHA filed its Reply brief in support of its motion to dismiss, the Ninth Circuit filed its decision in *Artichoke Joe's California Grand Casino v. Norton*, 353 F.3d 712, 2003 WL 22998116, *20 (9th Cir. Dec.22, 2003) ("when a state law applies in Indian country as a result of the state's participation in a federal scheme that 'readjusts' jurisdiction over Indians, that state law is reviewed as if it were federal law"). Understandably, *Artichoke Joe's* was not discussed in any party's brief, although it was discussed at the hearing. The parties are reminded to comply with Local Rule 7.8 (regarding reliance at a hearing on authorities not cited in briefs).

**5.** The preference at issue in *Morton* dated back to the Indian Reorganization Act of 1934, 417 U.S. at 542, 94 S.Ct. 2474, and

predated the Department of the Interior's 1978 regulations regarding recognition of Indian tribes. *See* 25 C.F.R. § 83.7.

**6.** The Equal Protection Clause provides that no state shall deny to any person within its jurisdiction the equal protection of the laws. One of its central purposes is to prevent the states from purposefully discriminating among individuals on the basis of race. *Shaw v. Reno*, 509 U.S. 630, 642, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993). Governmental action can run afoul of the Equal Protection Clause when the government explicitly classifies or distinguishes among persons by reference to impermissible criteria such as race, sex, religion, or ancestry. *De La Cruz v. Tormey*, 582 F.2d 45, 49 (9th Cir.1978), *cert. denied*, 441 U.S. 965, 99 S.Ct. 2416, 60 L.Ed.2d 1072 (1979).

are reviewed under the "rational basis" standard. *See Morton v. Mancari,* 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974). Defendants contend that this court should dismiss this action as involving a nonjusticiable political question because, in order to decide whether to apply the "strict scrutiny" or "rational basis" test, the court must decide what Defendants call the political question of whether Hawaiians and native Hawaiians are an "Indian tribe."

However, in the next breath, Defendants cite numerous cases that they say stand for the proposition that this court may apply a "rational basis" test without finding that Hawaiians and native Hawaiians are actually an "Indian tribe." *See* Office of Hawaiian Affairs Defendants' Supplemental Memorandum in Response to Questions Raised by the Court at the April 29, 2002 Hearing (filed April 29, 2002). For example, in *Alaska Chapter, Assoc. Gen. Contractors of Amer., Inc. v. Pierce,* 694 F.2d 1162 (9th Cir.1982), the Ninth Circuit applied the *Morton* analysis to benefits being provided to the indigenous people of Alaska. At the time *Pierce* was decided, those indigenous people had not been recognized by the Bureau of Indian Affairs as being "Indian tribes." *See* Bureau of Indian Affairs, Indian Tribal Entities That Have a Government–to–Government Relationship With the United States, 46 Fed. Regis. 35360 (1981). Nevertheless, *Pierce* applied the *Morton* analysis broadly, employing a rational basis test to benefits being provided to "any person recognized as being an Indian or Alaskan Native by a tribe, the Government, or any state." *Pierce,* 694 F.2d at 1168 n. 8. *Pierce* reasoned that, although the history of "Alaskan Natives" with the United States was different from that of "American Indians," the *Morton* analysis nevertheless applied because "Alaskan Natives" "have been considered to have the same status as other federally recognized American Indians." "Alaskan Natives" were "under the guardianship of the federal government and entitled to the benefits of the special relationship." *Id.* n. 10.

*Pierce* indicates that a court may decide the applicability of the *Morton* analysis without deciding the alleged political question of whether a group is an "Indian tribe." Accordingly, OHA has not met its burden of demonstrating that a nonjusticiable political question requires dismissal of this action. The court is not here deciding that it will apply a "rational basis" test. The court recognizes that Plaintiffs are arguing that *Pierce* has been called into doubt by *Rice v. Cayetano,* 528 U.S. 495, 120 S.Ct. 1044, 145 L.Ed.2d 1007 (2000). However, OHA's present motion is a motion to dismiss based on nonjusticiability; this motion does not require the court to determine what test it will apply if it examines the merits of Plaintiffs' claims. On OHA's nonjusticiability motion, the court instead rests its decision on OHA's failure to meet its burden of establishing that Plaintiffs present a nonjusticiable question requiring dismissal.

Order Granting in Part and Denying in Part Motions to Dismiss on Standing Grounds; Order Denying Motion to Dismiss (Or Reconsider Prior Order Finding Taxpayer Standing) on Political Question Grounds (May 8, 2002) at 28–31 (footnote omitted).

In the present motion, OHA claims that it is not arguing that a political question exists as to whether Congress has recognized or should recognize Hawaiians as Indians. Instead, OHA essentially assumes that Hawaiians have been so recognized and argues that the political question doctrine prevents this court's review of

how Congress chooses to provide benefits to native, indigenous people like Hawaiians.

■ Plaintiffs oppose the present motion by contending that it is an untimely motion for reconsideration. This court disagrees. The denial of OHA's previous motion merely stated that OHA had not met its burden of demonstrating it was entitled to summary judgment, not that the political question doctrine was inapplicable. OHA's earlier political question motion was denied because the cursory discussion of the doctrine in the midst of a discussion of many other issues did not sufficiently address the applicability of that doctrine to federal recognition of both Hawaiians and native Hawaiians in light of *Alaska Chapter, Associated General Contractors of America, Incorporated v. Pierce*, 694 F.2d 1162 (9th Cir.1982). OHA's present motion is devoted to the political question issue and does not merely rehash its earlier submission.

Plaintiffs' remaining claim does not challenge the provision of benefits to native Hawaiians (as some of Plaintiffs' other claims did). Accordingly, this court need not decide whether Congress has recognized and conferred benefits on native Hawaiians, as opposed to Hawaiians, through legislation such as the Hawaiian Homes Commission Act ("HHCA"), 42 Stat. 108, which, as with much of the Indian legislation passed by Congress, had as its purpose the rehabilitation of a native population. *Rice v. Cayetano*, 528 U.S. 495, 507, 120 S.Ct. 1044, 145 L.Ed.2d 1007 (2000); *see also* H.R.Rep. No. 839 at 2 (1920). Instead, the remaining issue before this court relates to whether Hawaiians have been recognized by Congress in a manner requiring this court to analyze OHA's programs under the rational basis test set forth in *Morton*.

OHA's political question argument is consistent with *Sandoval*, in which the Supreme Court noted that it is for Congress (not the courts) to determine the questions of whether, to what extent, and for how long the guardian-ward relationship between the United States government and Indian tribes exists. *Sandoval*, 231 U.S. at 46, 34 S.Ct. 1. However, Plaintiffs are not really seeking to disturb or alter the benefits being conveyed on Hawaiians. Instead, they are claiming that their constitutional rights are being violated by the state's restriction of those benefits to Hawaiians. Plaintiffs' claim is therefore similar to the claim asserted in *Morton*, in which the Supreme Court examined Indian legislation using a rational basis standard. *Morton* establishes, contrary to OHA's contention, that, under some circumstances, courts may review the provision of benefits to native groups.

Although OHA says that its motion does not argue that there is a political question as to whether Hawaiians have been treated by Congress as equivalent to Indians for purposes of the *Morton* analysis, that question is inextricably intertwined with OHA's argument that this court cannot review the choice Congress has made as to how best to provide benefits to Hawaiians. OHA's argument is premised on congressional recognition of Hawaiians and cannot be addressed without first determining whether that premise is viable.[7]

---

7. Plaintiffs argue that there is no political question in this case because *Morton* is inapplicable. Plaintiffs argue that, under *Rice v. Cayetano*, 528 U.S. 495, 120 S.Ct. 1044, 145 L.Ed.2d 1007 (2000), and another recent district court order pertaining to OHA elections,

*see Arakaki v. Hawaii*, Civil No. 00–514 HG/BMK, slip op. (D.Haw. Aug. 22, 2003), the benefits being provided to Hawaiians by OHA are race-based. Those cases are distinguishable, as they involved race-based challenges to elections under the Fifteenth Amendment,

Plaintiffs' remaining claim is not a challenge to benefits being provided to native Hawaiians under the HHCA.[8] Instead, the remaining issue in this case involves preferences given to Hawaiians (i.e., people of Hawaiian ancestry with no limitation on blood quantum) by OHA. To determine the level of scrutiny applicable to these preferences, this court must determine whether Hawaiians should be treated as federally recognized such that the *Morton* analysis is applicable. On this point, notwithstanding OHA's argument, Congress has sent mixed signals.

C. *Because Congress Has Sent Mixed Signals as to The Political Status of Hawaiians, and That Status is Currently Being Debated in Congress, the Political Status of Hawaiians is a Political Question.*

■ Historically, Congress did not provide for benefits to Hawaiians. *See, e.g.,* HHCA (limiting benefits to native Hawaiians). More recently, however, Congress has begun to provide benefits to Hawaiians in certain contexts. In the "Native Hawaiian Education Act," 20 U.S.C. §§ 7511 to 7517, for example, Congress attempts to

"authorize and develop innovative educational programs to assist Native Hawaiians." *See* 20 U.S.C. § 7513(1). These programs include grants benefitting "Native Hawaiians." *See* 20 U.S.C. § 7515(a). For purposes of the "Native Hawaiian Education Act," "Native Hawaiian" is defined without regard to Hawaiian blood quantum. 20 U.S.C. § 7517(A)(B) ("Native Hawaiian" is any "descendant of the aboriginal people who, prior to 1778, occupied and exercised sovereignty in the area that now comprises the State of Hawaii"). In the education context, District Judge Alan C. Kay has identified a special trust relationship recognized by Congress in the "Native Hawaiian Education Act." *See John Doe v. Kamehameha Schools / Bernice Pauahi Bishop Estate,* 295 F.Supp.2d 1141, 1168–1174 (D.Haw.2003).

Similarly, Congress has recently enacted the "Native Hawaiian Health Care Act of 1988," 42 U.S.C. §§ 11701–11714. For purposes of this act, "Native Hawaiians" is defined broadly to include all Hawaiians. *See* 42 U.S.C. § 11711(3) (defining "Native Hawaiians" as people who are citizens of the United States and descendants "of the

not preferences and/or benefits being provided to native populations allegedly based on their political, as opposed to racial, status. Moreover, Plaintiffs cite no clear authority indicating that *Morton* is no longer good law. The Supreme Court could have very easily ruled in *Rice* that *Morton* no longer applies, rather than stating that it would tread on "difficult terrain" if it had to determine whether native Hawaiians should be treated as Indians under *Morton.* As the Supreme Court did not overrule *Morton,* that case appears to remain good law.

**8.** If Plaintiffs had remaining claims challenging benefits being provided to native Hawaiians pursuant to the HHCA, Plaintiffs might be correct in arguing that the political question doctrine does not bar review of the challenge. As in *Morton,* a constitutional challenge to the HHCA would involve the examination of legislation from the earlier part

of the twentieth century (before the Department of the Interior issued regulations regarding recognition of Indian tribes) that conveyed benefits on native groups recognized by Congress at that time as needing those benefits. It would make little sense to say that native Hawaiians are not federally recognized under the 1978 Department of the Interior's regulations, as Congress itself appears to have recognized native Hawaiians as needing the United States' protection when the HHCA was enacted many years before. Thus, now-Chief Judge David A. Ezra determined that the court could review such a matter, but that the native Hawaiian preference provided for in the HHCA does not create a suspect classification and that the *Morton* analysis applies to that preference. *See Naliielua v. Hawaii,* 795 F.Supp. 1009, 1013 (D.Haw.1990).

aboriginal people, who prior to 1778, occupied and exercised sovereignty in the area that now constitutes the State of Hawaii."). In the "Native Hawaiian Health Care Act of 1988," Congress declared:

[I]t is the policy of the United States in fulfillment of its special responsibilities and legal obligations to the indigenous people of Hawaii resulting from the unique and historical relationship between the United States and the Government of the indigenous people of Hawaii—

(1) to raise the health status of Native Hawaiians to the highest possible health level; and

(2) to provide existing Native Hawaiian health care programs with all resources necessary to effectuate this policy.

42 U.S.C. § 11702(a).

In the "Native Hawaiian Health Care Act of 1988," Congress made legislative findings that Hawaiians were indigenous to Hawaii, 42 U.S.C. § 11701(1); that there was a trust relationship between the government and native Hawaiians, 42 U.S.C. § 11702(13); and that this "historical and unique legal relationship has been consistently recognized and affirmed by the Congress through the enactment of Federal laws which extend to the Hawaiian people the same rights and privileges accorded to American Indian, Alaska Native, Eskimo, and Aleut communities," 42 U.S.C. § 11702(19).

Congress has also recognized the "unique relationship" the United States has with Hawaiians in the "Native American Graves Protection and Repatriation Act," 25 U.S.C. §§ 3001–3013. For example, 25 U.S.C. § 3010 states: "This chapter reflects the unique relationship between the Federal Government and Indian tribes and Native Hawaiian organizations and should not be construed to establish a precedent with respect to any other indi-

vidual, organization or foreign government." For purposes of the "Native American Graves Protection and Repatriation Act," "Native Hawaiian" means "any individual who is a descendant of the aboriginal people who, prior to 1778, occupied and exercised sovereignty in the area that now constitutes the State of Hawaii." 25 U.S.C. § 3001(10).

Although Congress has enacted legislation that appears to equate Hawaiians to Indians and/or Indian tribes in some contexts, Congress has not yet passed the "Akaka Bill," which has been pending before Congress for several years and purports to express the policy of the United States with respect to the United States' relationship with "Native Hawaiians," defined by the Akaka Bill without reference to blood quantum. S. 344, 108th Cong. § 2 (2003) (in pertinent part, defining, "Native Hawaiians" as including "the indigenous, native people of Hawaii who are the direct lineal descendants of the aboriginal, indigenous, native people who resided in the islands that now comprise the State of Hawaii on or before January 1, 1893 . . . .").

Congress may have recognized Hawaiians as being in need of certain preferences in some contexts, but it has not yet clearly recognized Hawaiians as being equivalent to Indians or Indian tribes for purposes of the *Morton* analysis as to all benefits being provided to Hawaiians. Whether Hawaiians should be treated as being recognized by Congress such that the more lenient review standard found in *Morton* should be applied to Plaintiffs' Equal Protection challenge to programs being administered by OHA is an issue that is a nonjusticiable political question. As stated by Judge Kay in *Kahawaiolaa*, such a determination involves matters that have been constitutionally committed to the other branches and would show a lack

of respect to those branches. *Kahawaio-laa,* 222 F.Supp.2d at 1219.

### D. *Case Precedent Does Not Clearly Establish the Political Status of Hawaiians.*

The court recognizes that there are indeed circumstances in which courts can determine whether a native, indigenous group should be treated as equivalent to Indians for purposes of the *Morton* analysis. In *Pierce,* for example, the Ninth Circuit applied *Morton*'s rational basis standard in reviewing a preference being provided to Alaskan natives. Based on Supreme Court and Ninth Circuit precedent, *Pierce* held that Alaskan natives, despite the differences in their history from that of Indians, were "under the guardianship of the federal government and entitled to the benefits of the special relationship." *Pierce,* 694 F.2d at 1169 n. 20. But *Pierce* is limited to its facts. Although *Pierce* indicates that a court can sometimes determine whether a native, indigenous people should be treated like an Indian tribe for purposes of the *Morton* analysis, *Pierce* does not stand for the proposition that the courts always have that ability. In the present case, Congress is still speaking on the issue. It is precisely that circumstance that distinguishes *Pierce* from this case. The political process had progressed further in *Pierce* than it has here. The intent of Congress as to Hawaiians is not presently as clear as it was with respect to the Alaskan natives in *Pierce.* As Judge Kay recognized in *Kahawaiolaa,* Congress has begun to include Hawaiians as beneficiaries in bills providing services to Native Americans, although Hawaiians are not classified as Indians and have not been dealt with comprehensively by Congress. *Kahawaiolaa,* 222 F.Supp.2d at 1220 n. 9.

Of course, had Congress been long silent on the issue, the absence of express recognition by Congress of Hawaiians as equivalent to an Indian tribe would doubtless indicate that Hawaiians are not equivalent. A party challenging a classification may normally rely on such silence as indicating that a preference does not fall under the *Morton* analysis. But Congress is not silent here. It is speaking, but what it will conclude is unclear. It is in recognition of the continuing debate in Congress that this court defers to Congress.

The court notes that, although Judge Kay held that "Congress has not yet decided that it will deal with Native Hawaiians [sic] groups as political entities on a government-to-government basis," *Kahawaiolaa,* 222 F.Supp.2d at 1219, he also stated in dicta that the rational basis standard announced in *Morton* applied to benefits being provided to "Native Hawaiians." *Kahawaiolaa,* 222 F.Supp.2d at 1223 n. 14. It is not entirely clear whether Judge Kay was using the term "Native Hawaiians" to refer to persons with a certain blood quantum. This court declines to make any pronouncement at this time concerning the level of scrutiny applicable to Hawaiians (that is, leaving blood quantum aside). This court does not mean to indicate that it either agrees or disagrees with footnote 14 of *Kahawaiolaa* if it applies generally to Hawaiians, which is the group for which OHA provides benefits. Rather, this court's position is that this is a political issue that should be first decided by another branch of government.

In *Rice v. Cayetano,* 146 F.3d 1075, 1081 (9th Cir.1998), the Ninth Circuit recognized that "the special treatment of Hawaiians and native Hawaiians reflected in establishment of trusts for their benefit, and the creation of OHA to administer them, is similar to the special treatment of Indians that the Supreme Court approved in *Mor-*

*ton."* *Id.* However, when the Supreme Court reversed the Ninth Circuit, it noted that "[i]t is a matter of some dispute ... whether Congress may treat the native Hawaiians as it does Indian tribes." The Supreme Court said it "could stay far off that difficult terrain." *Rice,* 528 U.S. at 519, 120 S.Ct. 1044. Accordingly, the Supreme Court decision in *Rice* supports the proposition that another branch of government should make the decision as to whether Hawaiians should be treated as Indians for purposes of the *Morton* analysis.

## IV. CONCLUSION.

OHA's motion to dismiss is granted. Because no claims remain for adjudication, the Clerk of the Court is directed to enter final judgment in favor of the Defendants and to close this case.

IT IS SO ORDERED.