# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

EARL F. ARAKAKI; EVELYN C.
ARAKAKI; EDWARD U. BUGARIN;
SANDRA P. BURGESS; PATRICIA A.
CARROLL; ROBERT M. CHAPMAN;
MICHAEL Y. GARCIA; TOBY M.
KRAVET; JAMES I. KUROIWA;
FRANCES M. NICHOLS; DONNA
MALIA SCAFF; JACK H. SCAFF;
ALLEN TESHIMA; THURSTON TWIGG-
SMITH,
　　　　　　*Plaintiffs-Appellants,*

ANTHONY SANG, SR., State Council
of Hawaiian Homestead
Associations (SCHHA); STATE
COUNCIL OF HAWAIIAN HOMESTEAD
ASSOCIATIONS,
　　　　　　*Intervenors-Appellees,*

v.

LINDA C. LINGLE, in her official
capacity as Governor of the State
of Hawaii; HAUNANI APOLIONA,
Chairman, and in her official
capacity as trustee of the Office of
Hawaiian Affairs; ROWENA AKANA,
in his official capacity as trustee
of the Office of Hawaiian Affairs;
DONALD CATALUNA, in his official
capacity as trustee of the Office of
Hawaiian Affairs; LINDA DELA
CRUZ, in her official capacity as

No. 04-15306

D.C. No.
CV-02-00139-SOM/
KSC

OPINION

11853

trustee of the Office of Hawaiian Affairs; CLAYTON HEE, in his official capacity as trustee of the Office of HawaiianVa Affairs; COLETTE Y. MACHADO, in her official capacity as trustee of the Office of Hawaiian; CHARLES OTA, in his official capacity as trustee of the Office of Hawaiian Affairs; OSWALD K. STENDER, in his official capacity as trustee of the Office of Hawaiian Affairs; JOHN D. WAIHEE, IV, in his official capacity as trustee of the Office of Hawaiian Affairs; UNITED STATES OF AMERICA; JOHN DOES, 1 through 10; GEORGINA KAWAMURA, in her official capacity as Director of the Department of Budget and Finance; RUSS SAITO, in her official capacity as Comptroller and Director of the Department of Accounting and General Services; PETER YOUNG, in his official capacity as Chairman of the Board of Land and Natural Resources; SANDRA LEE KUNIMOTO, in her official capacity as Director of the Department of Argiculture; TED LIU, in his official capacity as Director of the Department of Business, Economic Development and Tourism; RODNEY HARAGA, in

his official capacity as Director of
the Department of Transportation;
QUENTIN KAWANANAKOA, member
of the Hawaiian Homes
Commission,
                    *Defendants-Appellees.*

Appeal from the United States District Court
for the District of Hawaii
Susan Oki Mollway, District Judge, Presiding

Argued and Submitted
November 1, 2004—Honolulu, Hawaii

Filed August 31, 2005

Before: Melvin Brunetti, Susan P. Graber, and Jay S. Bybee,
Circuit Judges.

Opinion by Judge Bybee

## COUNSEL

H. William Burgess, Honolulu, Hawaii, for the plaintiffs-appellants.

Sherry P. Broder, Honolulu, Hawaii; Girard D. Lau, Charleen M. Aina, Office of the Attorney General of Hawaii, Honolulu, Hawaii; Jon M. Van Dyke, William S. Richardson School of Law, Honolulu, Hawaii; Aaron P. Avila, U.S. Department of Justice, Washington, D.C.; Thomas A. Helper, Office of the U.S. Attorney, Honolulu, Hawaii, for the defendants-appellees.

Walter R. Schoettle, Honolulu, Hawaii; Robert Klein, Honolulu, Hawaii; Philip W. Miyoshi, McCorriston Miller Mukai MacKinnon LLP, Honolulu, Hawaii, for the intervenors-appellees.

Le'a Malia Kanehe, Native Hawaiian LegalCorp., Honolulu, Hawaii, for the amici curiae.

## OPINION

BYBEE, Circuit Judge:

In this case we are called on, yet again, to hear a challenge to state programs restricting benefits to "native Hawaiians" or "Hawaiians." *See, e.g., Carroll v. Nakatani*, 342 F.3d 934 (9th Cir. 2003); *Arakaki v. Hawaii*, 314 F.3d 1091 (9th Cir. 2002);

*Han v. U.S. Dep't of Justice*, 45 F.3d 333 (9th Cir. 1995) (per curiam); *Price v. Akaka*, 3 F.3d 1220 (9th Cir. 1993); *Price v. Hawaii*, 764 F.2d 623 (9th Cir. 1985); *Hoohuli v. Ariyoshi*, 741 F.2d 1169 (9th Cir. 1984); *Keaukaha-Panaewa Cmty. Ass'n v. Hawaiian Homes Comm'n*, 588 F.2d 1216 (9th Cir. 1978); *see also Rice v. Cayetano*, 528 U.S. 495 (2000).

Plaintiffs in this case are citizens of the State of Hawaii who allege that various state programs preferentially treat persons of Hawaiian ancestry, in violation of the Fifth and Fourteenth Amendments, 42 U.S.C. § 1983, and the terms of a public land trust. Plaintiffs brought suit against the Department of Hawaiian Home Lands ("DHHL"), the Hawaiian Homes Commission ("HHC"), the Office of Hawaiian Affairs ("OHA"), various state officers, and the United States. Plaintiffs claim standing to sue as taxpayers and as beneficiaries of the public land trust. In a series of orders, the district court held that Plaintiffs lacked standing to raise certain claims and that Plaintiffs' remaining claims raised a nonjusticiable political question, and dismissed the entire lawsuit. *Arakaki v. Lingle*, 305 F. Supp. 2d 1161 (D. Haw. 2004) ("*Arakaki VI*"); *Arakaki v. Lingle*, 299 F. Supp. 2d 1129 (D. Haw. 2003) ("*Arakaki V*"); *Arakaki v. Lingle*, 299 F. Supp. 2d 1114 (D. Haw. 2003) ("*Arakaki IV*"); *Arakaki v. Cayetano*, 299 F. Supp. 2d 1107 (D. Haw. 2002) ("*Arakaki III*"); *Arakaki v. Cayetano*, 299 F. Supp. 2d 1090 (D. Haw. 2002) ("*Arakaki II*"); *Arakaki v. Cayetano*, 198 F. Supp. 2d 1165 (D. Haw. 2002) ("*Arakaki I*"). The district court also issued three unpublished orders, dated December 16, 2003, January 26, 2004, and May 5, 2004, which this opinion will address.

We affirm in part and reverse in part. We hold that Plaintiffs lack standing to sue the federal government and that the district court therefore correctly dismissed all claims to which the United States is a named party or an indispensable party. We affirm the district court in finding that Plaintiffs have demonstrated standing as state taxpayers to challenge those state programs that are funded by state tax revenue and for

which the United States is not an indispensable party. Plaintiffs therefore have standing to bring a suit claiming that the OHA programs that are funded by state tax revenue violate the Equal Protection Clause of the Fourteenth Amendment. However, we reverse the district court's dismissal of that claim on political question grounds and hold that a challenge to the appropriation of tax revenue to the OHA does not raise a nonjusticiable political question. We therefore affirm in part, reverse in part, and remand.

## I. BACKGROUND

### A. *Historical Context*

After the arrival of Captain Cook in 1778, the western world became increasingly interested in the commercial potential of the Hawaiian Islands. The nineteenth century saw a steady rise in American and European involvement in the islands' political and economic affairs. As the resistance of the native Hawaiian government mounted, American commercial interests eventually succeeded, with the complicity of the U.S. military, in overthrowing the Hawaiian monarchy and establishing a provisional government under the title of the Republic of Hawaii. *See Rice*, 528 U.S. at 500-05.

In 1898, President McKinley signed a Joint Resolution to annex the Hawaiian Islands as a territory of the United States. 30 Stat. 750. This resolution, commonly referred to as the Newlands Resolution, provided that the Republic of Hawaii ceded all public lands to the United States and that revenues from the lands were to be "used solely for the benefit of the inhabitants of the Hawaiian Islands for educational and other public purposes." *Id.* Two years later, the Hawaiian Organic Act established the Territory of Hawaii and put the ceded lands in the control of the Territory of Hawaii "until otherwise provided for by Congress." Act of Apr. 30, 1900, ch. 339, § 91, 31 Stat. 159.

B.   *The Public Land Trust and the Hawaiian Homes
     Commission Act*

Shortly after the establishment of the Territory, Congress "became concerned with the condition of the native Hawaiian people." *Rice*, 528 U.S. at 507. Declaring its intent to "[e]stablish[ ] a permanent land base for the beneficial use of native Hawaiians," Congress enacted the Hawaiian Homes Commission Act, 1920. Act of July 9, 1921, ch. 42, § 101(b)(1), 42 Stat. 108 ("HHCA"). The HHCA set aside 200,000 acres of lands previously ceded to the United States for the creation of loans and leases to benefit native Hawaiians. These lands were to be leased exclusively, including by transfer, to native Hawaiians for a term of 99 years at a nominal rate of one dollar per year. *Id.* § 208(1), (2) & (5). The HHCA defines "native Hawaiian" as "any descendant of not less than one-half part of the blood of the races inhabiting the Hawaiian Islands previous to 1778." *Id.* § 201(7).

In 1959, Hawaii became the 50th State in the union. Under the Hawaii Statehood Admission Act, Congress required Hawaii to incorporate the HHCA into its state Constitution, with the United States retaining authority to approve any changes to the eligibility requirements for the HHCA leases. Act of March 18, 1959, Pub. L. No. 86-3, § 4, 73 Stat. 5 ("Admission Act"). *See* HAW. CONST. art. XII, §§ 1-3. In return, the United States granted Hawaii title to all public lands within the state, save a small portion reserved for use of the Federal Government. *Id.* § 5(b)-(d), 73 Stat. 5. The Admission Act further declared that the lands, "together with the proceeds from the sale or other disposition of any such lands and the income therefrom, shall be held by [the State] as a public trust for the support of the public schools, . . . the conditions of native Hawaiians" and other purposes. *Id.* § 5(f), 73 Stat. 6. The land granted to Hawaii included the 200,000 acres previously set aside under the HHCA and an additional 1.2 million acres.

The Hawaii Constitution expressly adopted the HHCA and declared that "the spirit of the Hawaiian Homes Commission Act looking to the continuance of the Hawaiian homes projects for the further rehabilitation of the Hawaiian race shall be faithfully carried out." HAW. CONST. art. XII, § 2. Because the HHCA's purposes include support of public education, the Constitution also provides that lands granted to Hawaii under the Admission Act will be held in "public trust for native Hawaiians and the general public." *Id.* § 4; *see Arakaki v. Hawaii*, 314 F.3d 1091, 1093 (9th Cir. 2002).

The HHCA established a Department of Hawaiian Home Lands ("DHHL"), to be headed by an executive board known as the Hawaiian Homes Commission ("HHC"). Act of July 9, 1921, ch. 42, § 202(a), 42 Stat. 108. By statute Hawaii created both the Department of Hawaiian Home Lands and the Hawaiian Homes Commission. Together, DHHL/HHC administer the 200,000 acres set aside by the HHCA, and DHHL/HHC's beneficiaries are limited to "native Hawaiians," as defined in the Act. The DHHL is funded in substantial part by state revenue; although the record is not clear on this point, this revenue likely derives from both tax and non-tax sources.

C.  *The Office of Hawaiian Affairs*

In 1978, Hawaii amended its Constitution to establish the Office of Hawaiian Affairs to " 'provide Hawaiians the right to determine the priorities which will effectuate the betterment of their condition and welfare and promote the protection and preservation of the Hawaiian race, and . . . [to] unite Hawaiians as a people.' " *Rice*, 528 U.S. at 508 (quoting 1 Proceedings of the Constitutional Convention of Hawaii of 1978, Committee of the Whole Rep. No. 13, p. 1018 (1980)). OHA holds title to all property "held in trust for native Hawaiians and Hawaiians," *except* for the 200,000 acres administered by DHHL/HHC; OHA thus controls the 1.2 million acres ceded by the United States in the Admission Act.

The term "native Hawaiians" has the same blood quantum requirement as under the HHCA; by contrast, the term "Hawaiians" is broader and simply refers to any persons descended from inhabitants of the Hawaiian Islands prior to 1778. HAW. REV. STAT. § 10-2. OHA's statutory purposes include "[a]ssessing the policies and practices of other agencies impacting on native Hawaiians and Hawaiians," "conducting advocacy efforts for native Hawaiians and Hawaiians," "[a]pplying for, receiving, and disbursing, grants and donations from all sources for native Hawaiian and Hawaiian programs and services," and "[s]erving as a receptacle for reparations." HAW. REV. STAT. § 10-3(4)-(6).

OHA administers funds received from two principal sources. First, OHA receives a 20 percent share of any revenue generated by the 1.2 million acres of lands held in public trust. HAW. REV. STAT. § 10-13.5 (1993). Second, OHA receives revenue from the state general fund, which derives from tax revenue and other, non-tax, sources.

D. *The Proceedings*

The Plaintiffs (some of whom qualify as "Hawaiians") allege that they are citizens of Hawaii, taxpayers of the state of Hawaii and of the United States, and beneficiaries of a public land trust created in 1898. The Complaint alleges three causes of action. First, Plaintiffs allege that the various programs of the OHA and DHHL/HHC violate the Equal Protection Clause of the Fourteenth Amendment and the equal protection component of the Due Process Clause of the Fifth Amendment. Second, they make these same allegations under 42 U.S.C. § 1983. Third, they claim that the administration of the OHA and the DHHL/HHC constitutes a breach of the public land trust.

The district court dismissed Plaintiffs' claims on grounds of standing and political question. With respect to the DHHL/HHC, the court ruled that the United States was an indispens-

able party to the lease eligibility requirements, but that Plaintiffs had no standing to sue the United States. *Arakaki* IV, 299 F. Supp. 2d at 1120-25. Because "any challenge to the lessee requirements of the Hawaiian Home Lands lease program set up by the HHCA, a state law, necessarily involves a challenge to the Admission Act," all claims against the DHHL/HHC were dismissed. *Id.* at 1126, 1127.

The district court took a slightly different route with respect to OHA. The court dismissed the breach of trust claim on the ground that Plaintiffs had not pleaded a breach of trust claim that is cognizable under the common law of trusts. *Arakaki* II, 299 F. Supp. 2d at 1103. Finding that Plaintiffs had state taxpayer standing to sue OHA, the court declined to dismiss OHA because, unlike DHHL/HHC, "[n]othing in the Admission Act requires the creation of OHA or governs OHA's actions." *Arakaki* IV, 299 F. Supp. 2d at 1127. The court limited the Plaintiffs' taxpayer challenge, however, to OHA programs funded from taxes, as opposed to programs funded from other sources. *Arakaki* II, 299 F. Supp. 2d at 1100-01; *Arakaki* IV, 299 F. Supp. 2d at 1122-24. In a subsequent decision, however, the district court dismissed all claims against OHA on the ground that they were barred by the political question doctrine. The court observed that, although Congress has plenary authority to recognize Indian tribal status, it has given Hawaiians some, but not all, of the privileges that go with formal tribal status. Because resolving Plaintiffs' equal protection claims would require the court to determine Hawaiians' political status in order to determine the appropriate level of scrutiny, the court declined to decide Hawaiians' current political status "in recognition of the continuing debate in Congress" and the principle that "this is a political issue that should be first decided by another branch of government." *Arakaki* VI, 305 F. Supp. 2d at 1173.

Plaintiffs appeal the dismissal of all their claims.

## II.  STANDARD OF REVIEW

Standing is a legal issue subject to *de novo* review. *Bruce v. United States*, 759 F.2d 755, 758 (9th Cir. 1985). In ruling on a FED. R. CIV. P. 12(b)(6) motion to dismiss for lack of standing, we must construe the complaint in favor of the complaining party. *Hong Kong Supermarket v. Kizer*, 830 F.2d 1078, 1080-81 (9th Cir. 1987). As the district court noted, whether dismissal on political question grounds is jurisdictional or prudential in nature, and thus whether it is properly classified under Rule 12(b)(1) or 12(b)(6), is unclear. *Compare Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 215 (1974) (presence of a political question, like absence of standing, deprives court of jurisdiction), *with Goldwater v. Carter*, 444 U.S. 996, 1000 (1979) ("the political-question doctrine rests in part on prudential concerns calling for mutual respect among the three branches of Government"). Either way, we review the district court's dismissal *de novo*. *See, e.g., Decker v. Advantage Fund, Ltd.*, 362 F.3d 593, 595-96 (9th Cir. 2004) (dismissal under Rule 12(b)(6) reviewed *de novo*); *Luong v. Circuit City Stores, Inc.*, 368 F.3d 1109, 1111 n.2 (9th Cir. 2004) (dismissal for lack of subject matter jurisdiction, pursuant to Rule 12(b)(1), reviewed *de novo*).

## III.  PLAINTIFFS' STANDING TO CHALLENGE THE DHHL/HHC LEASES

Plaintiffs claim standing to challenge the DHHL/HHC leases as land trust beneficiaries, and as state taxpayers. We find that neither theory confers standing to challenge the lease requirements or the appropriation of state revenue in support thereof. The district properly dismissed all claims against the DHHL/HHC and the United States.

### A.  *Plaintiffs' Standing as Land Trust Beneficiaries*

Plaintiffs challenge the public lands trust administered by DHHL/HHC because it prefers native Hawaiians in the lease

eligibility criteria for the 200,000 acres set aside in the HHCA and incorporated into the Hawaii Constitution through the Admission Act. The Plaintiffs argue that as members of the class of "native Hawaiians and general public," HAW. CONST. art. XII, § 4, they are trust beneficiaries, and may sue the trustee when the trustee's actions violate the law. *See* RESTATEMENT (SECOND) OF TRUSTS §§ 166, 214. Plaintiffs allege that the trustees—including DHHL/HHC and the United States—have enforced the provisions of the trust in violation of the Fifth and Fourteenth Amendments.

### 1. The United States as Trustee

Plaintiffs argue that the trust obligations of the United States arise through two acts, the Newlands Resolution and the Admission Act. Plaintiffs claim the trust was first established in 1898 by the Newlands Resolution with the United States as trustee. Congress, according to Plaintiffs, then violated its duties as trustee by discriminating on the basis of race when it enacted the HHCA in 1921 and again in the Admission Act when it required Hawaii to incorporate the HHCA into its Constitution. Alternatively, Plaintiffs argue that the United States became a trustee as a result of the Admission Act.[1]

The history of the land trust does not support either of Plaintiffs' theories. The United States is not currently a trustee of the lands in question by virtue of either the Newlands Resolution or the Admission Act. The Newlands Resolution recited that the Government of the Republic of Hawaii ceded

---

[1]The district court concluded that Plaintiffs had waived the Newlands Resolution theory, and addressed only the Admission Act theory. *Arakaki II*, 299 F. Supp. 2d at 1101. Plaintiffs deny the waiver. However, this court can affirm the district court's dismissal on any ground supported by the record, even if the district court did not rely on the ground. *See, e.g., Livid Holdings Ltd. v. Salomon Smith Barney, Inc.,* 403 F.3d 1050, 1058 (9th Cir. 2005). In the interest of being thorough, we therefore address both theories.

"the absolute fee and ownership of all public Government, or Crown lands." Newlands Resolution, 30 Stat. 750 (1898). It further provided that existing U.S. laws regarding public lands would not apply to Hawaiian lands, but that Congress "shall enact special laws for their management and disposition: *Provided*, That all revenue from or proceeds of the same . . . shall be used solely for the benefit of the inhabitants of the Hawaiian Islands for educational and other public purposes." *Id.* Although this passage did not specifically use the word "trust," the Attorney General of the United States subsequently interpreted it "to subject the public lands in Hawaii to a special trust." *Hawaii — Public Lands*, 22 Op. Att'y Gen. 574, 576 (1899).

Assuming, *arguendo*, that the Attorney General was right to construe the Newlands Resolution as establishing a trust, and assuming further that the United States became a trustee, the United States' status as trustee was expressly subject to future revision. The Resolution specifically provides that "the United States shall enact special laws for [the] management and disposition" of public lands. The Attorney General construed this provision as "vest[ing] in Congress the exclusive right, by special enactment, to provide for the disposition of public lands in Hawaii." *Id.* The Newlands Resolution thus contemplated that Congress would enact subsequent rules to govern the ceded lands.

**[1]** Congress enacted such rules in the HHCA and the Admission Act. Any trust obligation the United States assumed in the Newlands Resolution for the lands at issue here was extinguished by Congress when it created the DHHL/HHC in the HHCA and granted it control of defined "available lands." Act of July 9, 1921, ch. 42, §§ 202, 204, and 207; s*ee id.* § 204(a) ("Upon the passage of this Act, all available lands shall immediately assume the status of Hawaiian home lands and be under the control of the department to be used and disposed of in accordance with the provisions of this Act."). Any lingering doubt over the United States' role

as trustee was eliminated entirely in the Admission Act when the United States "grant[ed] to the State of Hawaii, effective upon its admission in the Union, the United States' title to all the public lands and other public property, and to all lands defined as 'available lands' by section 203 of the Hawaiian Homes Commission Act . . . title which is held by the United States immediately prior to its admission into the Union." Pub. L. No. 86-3, § 5(b), 73 Stat. 4.

**[2]** Our discussion here also resolves Plaintiffs' claim that the Admission Act established the United States' obligations as a trustee. The Admission Act unambiguously requires that land be held in public trust, but by the State of Hawaii, not the United States. Nothing in the Admission Act suggests that the United States would serve as a co-trustee with the State. Nor does the fact that the United States must consent to changes in the qualifications of lessees under the trust make the United States a co-trustee. *See* Pub. L. No. 86-3, § 4, 73 Stat. 4. Congress might have made the United States a co-trustee; instead it reserved to the United States the right to bring suit for breach of trust, *id.* § 5(f), a provision at odds with the suggestion that the United States remains a trustee. We conclude, as we noted in *Keaukaha-Panaewa Cmty. Ass'n v. Hawaiian Homes Comm'n*, 588 F.2d 1216, 1224 n.7 (9th Cir. 1978), that "[t]he United States has only a somewhat tangential supervisory role of the Admission Act, rather than the role of trustee."

## 2. The United States as an Indispensable Party

Although the United States cannot be sued on Plaintiffs' trust beneficiary theory, Plaintiffs nevertheless argue that they may at least sue the state defendants on the same theory. Plaintiffs point to several cases in which we have held that native Hawaiians, as trust beneficiaries, could bring suit under 42 U.S.C. § 1983 against the State to enforce the terms of the trust. *E.g.*, *Price v. Akaka*, 928 F.2d 824 (9th Cir. 1990); *Keaukaha-Panaewa Cmty. Ass'n v. Hawaiian Homes*

*Comm'n*, 739 F.2d 1467 (9th Cir. 1984); s*ee also Price v. Akaka*, 3 F.3d 1220, 1223-25 (9th Cir. 1993). Those cases involved claims that the state was improperly administering the trust and sought to enforce the trust's terms.

We believe that this argument is disposed of easily. Those cases differ from the present challenge in a fundamental way: although those previous § 1983 cases have involved suits to enforce the express terms of the trust, this suit, by contrast, asks the court to prohibit the enforcement of a trust provision. That is, Plaintiffs now raise a § 1983 claim that is unique in that it does not seek to *enforce* the substantive terms of the trust, but instead challenges at least one of those terms as constitutionally *unenforceable*.

**[3]** We have recently held that in any challenge to the enforceability of the lease eligibility requirements, the United States is an indispensable party. In *Carroll v. Nakatani*, 342 F.3d 934 (9th Cir. 2003), a non-native Hawaiian citizen challenged the homestead lease program administered by DHHL/ HHC. The plaintiff sued the relevant state actors, but failed to sue the United States. We held that Section 4 of the Admissions Act "expressly reserves to the United States that no changes in the qualifications of the lessees may be made without its consent." *Carroll*, 342 F.3d at 944. We reasoned that because the qualifications for the DHHL/HHC leases cannot be modified without the United States' approval, the United States is an indispensable party to any lawsuit challenging the DHHL/HHC leases, and the Plaintiff's failure to sue the United States meant that his injury was not redressable. *Id.* at 944.

**[4]** Here, unlike in *Carroll*, Plaintiffs properly named the United States as a party. *Carroll*'s logic nonetheless applies. Plaintiffs lack standing to sue the United States, but the United States is an indispensable party to any challenge to the lease eligibility requirements. Plaintiffs therefore cannot maintain their challenge to the lease eligibility requirements

against the State. Accordingly, the district court properly dismissed the Plaintiffs' trust beneficiary claim against the state defendants.

## B. *Plaintiff's Standing As State Taxpayers*

Plaintiffs also challenge the DHHL/HHC lease eligibility programs in their capacity as state taxpayers. The question is whether our decision in *Carroll* bars Plaintiffs' equal protection challenge in their capacity as taxpayers, just as it barred Plaintiffs' suit in their capacity as trust beneficiaries. In particular, we must decide whether Plaintiffs have standing to challenge Hawaii's spending of tax revenues on the lease program.[2] This is a more complicated question.

The standing doctrine, like other Article III doctrines concerning justiciability, ensures that a plaintiff's claims arise in a "concrete factual context" appropriate to judicial resolution. *Valley Forge Christian Coll. v. Ams. United For Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982). Standing ensures that, no matter the academic merits of the claim, the suit has been brought by a proper party. The " 'irreducible constitutional minimum of standing' " requires that a plaintiff allege that he has suffered concrete injury, that there is a causal connection between his injury and the conduct com-

---

[2]Plaintiffs do not limit their challenge to the expenditure of state tax revenues; instead, they challenge *all* state spending on the lease program, whether funded by taxes, bonds, the proceeds of a settlement, or other non-tax revenues. The district court held that, if Plaintiffs could bring their equal protection claims against DHHL/HHC based on their taxpayer status at all, they could challenge only those avenues of state funding that actually derived from taxes, rather than from other sources. Because we conclude, like the district court, that *Carroll* precludes Plaintiffs' challenge to Hawaii's spending on the lease program regardless of the source of the state's funds, we need not decide here whether the district court correctly limited the scope of Plaintiff's state taxpayer challenges. We limit our discussion to Plaintiffs' challenge to Hawaii's spending of tax revenues on the lease program and address the general question regarding the scope of standing as a state taxpayer in Part IV.A.3, *infra*.

plained of, and that the injury will likely be redressed by a favorable decision. *United States v. Hays*, 515 U.S. 737, 742-43 (1995) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).

Plaintiffs have alleged that Hawaii has supported the lease program through tax revenues, a point that Hawaii does not dispute. *Arakaki* II, 299 F. Supp. 2d at 1098. Hawaii's taxing and spending in support of the lease program is not mandated by the Admission Act or any other federal law. The Admission Act requires Hawaii to adopt the HHCA and forbids Hawaii to change the lease eligibility requirement without the consent of the United States; but neither the Admission Act nor the HHCA, as incorporated by the Hawaii Constitution, mandates the expenditure of state funds, much less the expenditure of state tax revenues. Pub. L. No. 86-3, § 4, 73 Stat. 4. Section 5(f) of the Admission Act does provide that proceeds from the sale or other disposition of the lands shall be paid into the trust for the identified purposes, but nothing suggests, much less requires, that the State of Hawaii expend tax revenues to support the lease program. Any tax revenues Hawaii has appropriated to DHHL/HHC, then, resulted from decisions by the Hawaii Legislature.

Plaintiffs' taxpayer-based claims might be construed as a limited challenge to the lease program: Plaintiffs challenge the lease program to the extent that Hawaii has—independent of any federal obligation, including the Admission Act—engaged in taxing and spending in support of the DHHL/HHC program. Under this theory, unlike their trust beneficiary theory, Plaintiffs would not challenge the lease eligibility requirements directly, nor would they implicate any substantial rights belonging to the United States. Thus, Plaintiffs might argue, even if they cannot seek to enjoin the native Hawaiians-only rule directly, they can seek to enjoin further state funding of a provision that allegedly violates the Equal Protection Clause. Plaintiffs' remedy, presumably, would be

an injunction against spending state tax revenues, but not an order directing changes in the lease criteria.

[5] Plaintiffs' theory, though game, ultimately fails under *Carroll*. The only ground Plaintiffs have alleged for enjoining the state from spending is that the spending is for purposes prohibited by the Equal Protection Clause. Any remedy that Plaintiffs seek—for example, an injunction against expenditure of tax revenues for the lease program—demands that the district court decide whether the lease eligibility criteria are constitutional. The lease criteria are found in the HHCA which is adopted by Article XII of the Hawaii Constitution. We held in *Carroll*, however, that "Article XII of the Hawaiian Constitution cannot be declared unconstitutional without holding [Section 4] of the Admissions Act unconstitutional." *Carroll*, 342 F.3d at 944. Our decision in *Carroll* effectively holds that any challenge to Article XII is a challenge to Section 4 of the Admission Act, and no challenge to the Admission Act may proceed without the presence of the United States as a defendant.

[6] As state taxpayers, Plaintiffs have no basis for suing the United States. They claim no status that would distinguish them from any number of other persons who also do not qualify for the Hawaiian Home Lands leases. The Court has "repeatedly refused to recognize a generalized grievance against allegedly illegal government conduct as sufficient for standing." *Hays*, 515 U.S. 743. Moreover, "[t]he rule against generalized grievances applies with as much force in the equal protection context as in any other." *Id.; see Allen v. Wright*, 468 U.S. 737, 751 (1984). Federal taxpayer standing which, notably, Plaintiffs do not assert, is simply one instance of the assertion of a generalized grievance. *See Frothingham v. Mellon*, 262 U.S. 447, 487-88 (1923) ("The administration of any statute, likely to produce additional taxation to be imposed upon a vast number of taxpayers, the extent of whose several liability is indefinite and constantly changing, is essentially a matter of public and not of individual concern.").

**[7]** We hold that Plaintiffs cannot avoid the implications of *Carroll* by limiting their claims to state spending in support of the lease program and then alleging their state taxpayer status. Even if Plaintiffs have standing as state taxpayers—a subject we address in earnest in Part IV —that status cannot supply standing against the United States. *See, e.g., Frothingham*, 262 U.S. at 486-87 (citing *Crampton v. Zabriskie*, 101 U.S. 601, 609 (1880)); *W. Mining Council v. Watt*, 643 F.2d 618, 631 (9th Cir. 1981). Accordingly, we conclude that Plaintiffs lack standing to sue the United States, and that the United States remains an indispensable party to any challenge to the DHHL/HHC lease eligibility criteria. We affirm the district court's dismissal of all claims against the United States and DHHL/HHC.

## IV.   PLAINTIFFS' STANDING TO CHALLENGE OHA'S PROGRAMS

As with DHHL/HHC, Plaintiffs allege two theories of standing to challenge OHA: they challenge the appropriation of state tax revenue based on their status as state taxpayers, and they challenge the appropriation of trust revenue to OHA based on their alleged status as trust beneficiaries. Relying in large measure on our decision in *Hoohuli v. Ariyoshi*, 741 F.2d 1169 (9th Cir. 1984), the district court held that Plaintiffs had standing to sue OHA as state taxpayers. *Arakaki* II, 299 F. Supp. 2d at 1094-98. The court further held, however, that Plaintiffs lacked standing to challenge state funding of OHA that did not originate in taxes, specifically, any revenue that OHA received from lease rentals, settlements, or state bonds. *Id.* at 1100-01. With respect to the trust revenue claim, the district court dismissed the breach of trust claim on the ground that Plaintiffs had not pleaded a trust claim that was cognizable under the common law of trusts. *Id.* at 1103.

OHA contends that the district court erred because our prior decision in *Hoohuli* has been effectively overruled by *ASARCO Inc. v. Kadish*, 490 U.S. 605 (1989), and because

the United States is an indispensable party under *Carroll*. Plaintiffs allege that the district court erred by restricting the scope of their challenge to OHA programs directly funded by taxes.

We address each of these contentions in turn. We conclude that *Hoohuli* remains valid law in this circuit and that the United States is not an indispensable party to the suit challenging the appropriation of state tax revenue. Accordingly, Plaintiffs have standing as state taxpayers to challenge the appropriation of state revenue to OHA. We agree with the district court, however, that Plaintiffs' state taxpayer standing limits their claims to revenue that derives directly from taxes. Finally, we conclude, as we did in the prior section, that Plaintiffs cannot prevail on their trust beneficiary theory of standing because the United States remains an indispensable party to a suit challenging the trust, and Plaintiffs have no standing to sue the United States.

## A. *Plaintiffs' State Taxpayer Standing*

### 1. The Vitality of *Hoohuli*

**[8]** In *Hoohuli*, residents of Hawaii and a taxpayers' group brought suit under 42 U.S.C. § 1983 for damages and injunctive relief to challenge programs administered by OHA to the extent those programs favored "Hawaiians." 741 F.2d at 1172. We held that at least some of the individual plaintiffs had standing to seek to enjoin the "appropriating, transferring, and spending" of taxpayers' money from the state treasury's general fund. *Id.* at 1180. The plaintiffs had alleged that they had " 'been burdened with the necessity to provide more taxes to support [the class of "Hawaiians"]' " and that this was sufficient to sustain a " 'good-faith pocketbook action' set forth in *Doremus* [*v. Board of Education*, 342 U.S. 429, 434 (1952)]." *Id.*

Conceding that *Hoohuli* controls this case unless there is an intervening change in the law, OHA argues that the Supreme Court's decision in *ASARCO* has effectively overruled *Hoohuli*. *See Price v. Akaka*, 3 F.3d 1220, 1224 (9th Cir. 1993) (addressing an analogous argument that an intervening Supreme Court decision overruled our precedent). In *ASARCO*, Arizona taxpayers brought suit in Arizona state court to enjoin a state law governing mineral leases on state lands. The taxpayer plaintiffs alleged that the state lands had been granted to Arizona by the United States when it acquired statehood and that the statute violated the terms Congress specified for the disposal of lands granted by the U.S. to Arizona. Reviewing a judgment of the Arizona Supreme Court, the U.S. Supreme Court considered "whether, under federal standards, the case was nonjusticiable at its outset because the original plaintiffs lacked standing to sue." 490 U.S. at 612. Four members of the Court[3] held that if the plaintiffs had brought the suit in federal court, they would not have had standing by virtue of their status as state taxpayers. They noted that "[a]s an ordinary matter, suits premised on federal taxpayer status are not cognizable in the federal courts," but that "the same conclusion may not hold for municipal taxpayers." *Id.* at 613 (Kennedy, J.). They observed that it has "likened state taxpayers to federal taxpayers, and thus we have refused to confer standing upon a state taxpayer absent a showing of 'direct injury,' pecuniary or otherwise." *Id.* at 613-14 (quoting *Doremus*, 342 U.S. at 434). Ultimately the Court concluded that, although the plaintiffs (respondents in the Supreme Court) would not have had standing to commence suit in federal court, the petitioner-defendants had standing to seek review in the Supreme Court of a judgment

---

[3]Although we have occasionally referred to that portion of Justice Kennedy's opinion, Part II.B.1, as a plurality, *see, e.g., Graham v. Federal Emergency Mgmt. Agency*, 149 F.3d 997, 1003 (9th Cir. 1998), that is not strictly correct. Because Justice Brennan wrote an opinion concurring in the judgment on behalf of four justices, and Justice O'Connor did not participate in the decision, Part II.B.1 of Justice Kennedy's opinion is for an equally divided Court.

from Arizona courts that are not themselves bound by federal standing rules. *Id.* at 617-19. Four justices argued that the question of the standing of the state taxpayers was " 'irrelevant' when the petitioners were defendants below, and the plurality's discussion was therefore 'unnecessary.' " *Id.* at 633-34 (Brennan, J., concurring in part and concurring in the judgment).

Whether Justice Kennedy's opinion is dictum or not, that portion of his opinion on state taxpayer standing is not the opinion of the Supreme Court. *See, e.g., Marks v. United States*, 430 U.S. 188, 193 (1977); *see also Townsend v. Quasim*, 328 F.3d 511, 519 n.3 (9th Cir. 2003) (citing *Smith v. Univ. of Wash., Law Sch.*, 233 F.3d 1188, 1199 (9th Cir. 2000)). It may carry persuasive value to a court that has not previously ruled on state taxpayer standing, but an opinion from an evenly divided Court is not a precedentially binding intervening opinion of the Court. We therefore may not hold our prior opinion in *Hoohuli* overruled by an opinion of four Justices, even if we thought it persuasive, without obtaining en banc review.

The state defendants point to our statement in *Bell v. City of Kellogg* that "[t]he same constitutional standing principles apply to those suing in federal court as state taxpayers" as evidence that we have embraced Justice Kennedy's view. 922 F.2d 1418, 1423 (9th Cir. 1991) (citing *ASARCO*, 490 U.S. at 612). We explained in *Cammack v. Waihee* that in *Bell* "we implied some sympathy toward Justice Kennedy's views. However, we also made clear that *Hoohuli* remained the controlling circuit precedent. *Bell* should not be interpreted as altering the law of this circuit on state taxpayer standing." 932 F.2d 765, 770 n.9 (9th Cir. 1991) (citations omitted).

**[9]** Notwithstanding our statement in *Cammack*, the state defendants bravely argue that after *ASARCO*, *Hoohuli's* state taxpayer standing principle is limited to Establishment Clause cases. *See*, *e.g.*, *PLANS v. Sacramento City Unified Sch. Dist.*,

319 F.3d 504 (9th Cir. 2003); *Doe v. Madison Sch. Dist. No. 321*, 177 F.3d 789 (9th Cir. 1999) (en banc); *Cammack*, 932 F.2d 765. There is no principled basis for this argument in our cases. First, for the reasons we have explained, *Hoohuli* remains good law and is very much on point here. Second, neither *ASARCO* nor *Hoohuli* involved Establishment Clause claims; neither case says anything about the Establishment Clause. OHA has not explained why *ASARCO* effectively overrules *Hoohuli* except in Establishment Clause cases. Third, the state parties point to *Cammack*, in which we found state and municipal taxpayer standing in Hawaii residents who claimed that Hawaii's Good Friday holiday violated the Establishment Clause. Nothing in *Cammack* purports to limit state taxpayer standing to Establishment Clause cases. Much to the contrary, *Cammack* described *Hoohuli* as "the leading case on this issue in the circuit," 932 F.2d at 769, denied that *ASARCO* affected *Hoohuli*, *id.* at 770 n.9, and distinguished any contrary implication in *Bell, id.* It is difficult to conceive of a clearer affirmation of *Hoohuli's* status in this circuit. *See also Doe*, 177 F.3d at 794 (en banc) (citing *Hoohuli* favorably). Our decision in *Hoohuli* remains the law of the circuit until our court, sitting en banc, overrules it, or until the Supreme Court, in a majority opinion, plainly undermines its principles.

### 2.  The United States as an Indispensable Party

OHA argues that even if Plaintiffs have taxpayer standing, under *Carroll* the United States is also an indispensable party to any equal protection challenge to its programs. The district court rejected the argument on the ground that DHHL/HHC and OHA have distinct origins. In contrast to DHHL/HHC, "[n]othing in the Admission Act requires the creation of OHA or governs OHA's actions." *Arakaki* IV, 299 F. Supp. 2d at 1127.

**[10]** The district court is correct with respect to OHA's expenditure of tax revenue. OHA was created nearly twenty

years after Hawaii's admission to the union. In 1978, Hawaii amended its Constitution to add Sections 5 and 6—creating OHA and defining its duties—to Article XII. *See* HAW. CONST. art. XII, §§ 5-6. The Constitution does not provide for OHA's funding, which is provided by statute. *See*, *e.g.*, HAW. REV. STAT. §§ 10-3(1) ("A pro rata portion of all funds derived from the public land trust shall be funded in an amount to be determined by the legislature."), 10-13.5 ("Twenty per cent of all funds derived from the public land trust . . . shall be expended by [OHA] . . . ."). Unlike the lease eligibility requirement imposed by the HHCA and administered by DHHL/HHC, the United States has no right to consent or withhold consent to the creation of OHA or its administration of programs for native Hawaiians or Hawaiians. Because Plaintiffs can prevail against OHA "without holding [Section 4] of the Admissions Act unconstitutional," nothing "requires the participation of . . . the United States." *Carroll*, 342 F.3d at 944. We decline to extend *Carroll* to claims against OHA concerning tax revenue.

### 3. Limiting Plaintiffs' State Taxpayer Claims

Plaintiffs contend that the district court erred when it denied Plaintiffs' right to "seek invalidation of . . . OHA *in toto*." *Arakaki* IV, 299 F. Supp. 2d at 1122. Although the parties have stipulated that the legislature has appropriated monies from the General Fund to OHA, the district court held that "to the extent . . . OHA programs rely on funds other than tax money, Plaintiffs do not have state taxpayer standing to challenge those programs," *id.* at 1123-24, including home land lease revenues, payments of settlements, and bond revenues. *Arakaki* II, 299 F. Supp. 2d at 1100-01.

The issue Plaintiffs raise is this: Does a taxpayer have standing to challenge government spending if the funds actually challenged did not accrue as a result of taxes? While we think that to state the question is nearly to answer it, the parties have not located any case directly on point. The answer,

nevertheless, is implicit in the Supreme Court's limited recognition of taxpayer standing.

As we have discussed, in order to satisfy the case or controversy provision of Article III, a federal plaintiff must demonstrate an injury in fact, a causal relationship between the injury and the conduct complained of, and that the injury can be redressed. *Lujan*, 504 U.S. at 560. The whole theory of taxpayer standing is that if the suit is successful, the court will enjoin the spending which will relieve the plaintiff's tax burden. The Court has hesitated to recognize federal taxpayer standing because any effect on federal spending may only remotely affect the parties' tax bill. As the Court wrote in *Frothingham v. Mellon*, a federal taxpayer's "interest in the moneys of the Treasury . . . is shared with millions of others . . . and the effect upon future taxation, of any payment out of the funds, is so remote, fluctuating and uncertain, that no basis is afforded for [judicial review]." 262 U.S. at 487. If the "remote[ness]" and "uncertain[ty]" of the remedy was so great that the taxpayers did not have Article III standing, it only stands to reason that the taxpayer would lack standing if the "effect upon future taxation" was nil because taxes were not involved at all. *See Flast v. Cohen*, 392 U.S. 83, 92 (1968) ("the petitioner in *Frothingham* was denied standing not because she was a taxpayer but because her tax bill was not large enough:"); LAURENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW 421 (3d ed. 2000) ("[A]n individual may have a sufficient interest, in his or her capacity as a taxpayer, to challenge *spending* programs of the taxing government, on the theory—or, more candidly, the fiction—that a successful suit against such a program can result in some decrease in the litigant's taxes.").

**[11]** In *Flast*, 392 U.S. at 102, the Court emphasized that "a taxpayer will be a proper party to allege the unconstitutionality only of exercises of congressional power under the taxing and spending clause of Art. I, § 8, of the Constitution. It will not be sufficient to allege an incidental expenditure of tax

funds in the administration of an essentially regulatory statute." *Id.* at 102. A taxpayer must demonstrate "a measurable appropriation or disbursement of . . . funds occasioned solely by the activities complained of." *Doremus*, 342 U.S. at 434. In a series of cases, the Court rejected taxpayer standing in circumstances in which no tax expenditures were involved, even though the challenged program, if found unconstitutional, might have saved the public fisc. In *Valley Forge College*, for example, the plaintiffs complained of a transfer of surplus government property to a religiously affiliated college. The Court held that the plaintiffs lacked standing as federal taxpayers: "the property transfer about which [plaintiffs] complain was not an exercise of authority conferred by the Taxing and Spending Clause . . . [but] an evident exercise of Congress' power under the Property Clause . . . . Respondents do not dispute this conclusion, and it is decisive of any claim of taxpayer standing." 454 U.S. at 480 (citations omitted). *See also Schlesinger*, 418 U.S. at 228; *United States v. Richardson*, 418 U.S. 166, 174-75 (1974).

**[12]** Our cases follow this principle consistently. In *Doe*, we held that taxpayers lacked standing to challenge the practice of sponsoring prayers at high school graduation because "Doe identifie[d] no tax dollars that defendants spent solely on the graduation prayer, which is the only activity that she challenges." 177 F.3d at 794. The fact that the school district expended funds for graduation generally was irrelevant to the standing inquiry. Similarly, in *Cammack*, we held that Hawaii taxpayers had standing to challenge a Hawaii statute making Good Friday a state holiday. We specifically found that the complaint sufficiently alleged that "state and municipal tax revenues fund the paid holiday for government employees" and that the "actual expenditure of tax dollars" stated "the necessary injury." 932 F.2d at 771, 772; *see also Cantrell v. City of Long Beach*, 241 F.3d 674, 683 (9th Cir. 2001) ("To establish standing in a state or municipal taxpayer suit under Article III, a plaintiff must allege a direct injury caused by the expenditure of tax dollars.").

If we permitted Plaintiffs to challenge OHA's programs across the board, irrespective of the origin of the funding, it would greatly expand the effect of their taxpayer standing to programs that they would not otherwise have standing to challenge. Given the care with which the Supreme Court has looked at taxpayer injury and redressability, we cannot go so far. *See, e.g., Allen*, 468 U.S. at 751-53; *see also Lujan*, 504 U.S. at 560.

Plaintiffs object to the district court's disallowing its standing to challenge three sources of OHA funding: (1) funds received from the Hawaiian home lands trust, (2) funds received through a settlement of prior claims, and (3) bonds issued to secure the settlement. By law twenty percent of "all funds derived from the public land trust" are dedicated to the use of OHA. HAW. REV. STAT. § 10-13.5. The funds OHA receives from the trust, which are apparently largely rents, are first paid into Hawaii's General Fund and then paid to OHA. *See Arakaki* II, 299 F. Supp. 2d at 1100. The district court found that this was simply an "administrative 'pass-through' " and concluded that because these are dedicated funds, the fact that the funds pass through the General Fund is irrelevant. We agree with the district court that Plaintiffs, as taxpayers, may not challenge the expenditure of such non-tax revenues.

Plaintiffs' challenge to funds paid in settlement is more complicated. In 1993, the legislature appropriated more than $135 million to OHA's trust fund to settle past claims. The district court questioned whether, as taxpayers, Plaintiffs could challenge the settlement since it would "nullify[ ] a settlement reached years earlier" and "would be tantamount to having the court review the wisdom, at any time, of every legislative decision, regardless of when made, to settle a case rather than to litigate it." *Id.* at 1100 & n.10. The district court's concerns are well-stated, but we do not need to go so far as to hold that taxpayers may never challenge a legislature-ordained settlement.

The provenance of the settlement at issue here is quite unusual. As we have pointed out, when Hawaii created the OHA, it allocated to OHA twenty percent of "all funds derived" from the public land trust. HAW. REV. STAT. § 10-13.5. The statute, however, did not define the term "funds," and it was not clear what OHA was entitled to receive. In 1983, OHA's trustees filed suit against various state officials, claiming that OHA had not received its twenty percent share of "funds," specifically settlements concerning lands in the public trust. On appeal, the Hawaii Supreme Court ruled that the term "funds" was so ambiguous that the court could not resolve the intra-government dispute, and it declined judgment because of the state's political question doctrine. *Trustees of Office of Hawaiian Affairs v. Yamasaki*, 174-75, 737 P. 2d 446, 458 (Haw. 1987). In response, the Hawaii Legislature amended Section 10-13.5, substituting the word "revenue" for "funds." Act 304, § 7, HAW. SESS. LAWS 947, 951 (1990). In 1993, the legislature appropriated $136.5 million to OHA in settlement of OHA's claims from 1980 through 1991. *Id.* § 8, HAW. SESS. LAWS at 951; Act 35, § 3, HAW. SESS. LAWS 41 (1993).[4] Whatever the revenue origins of the $136.5 million allocated in 1993, the legislature paid these funds as compensation for revenues that OHA did not receive between 1980-91 that were generated by the public land trust. Since the original revenues were not tax-based, Plaintiffs lack standing to challenge these expenditures.

[13] For similar reasons, Plaintiffs cannot challenge the bonds issued by the state to fund these settlements. Whether some tax monies are used to service or repay the bonds, the bonds fund a settlement of land revenues owed to OHA. We affirm the district court's ruling that Plaintiffs may not chal-

---

[4]In *Office of Hawaiian Affairs v. State*, 31 P.3d 901 (Haw. 2001), the Hawaii Supreme Court ruled that the 1990 amendments to Section 10-13.5 conflicted with federal law. Under Hawaii law, Section 10-13.5 was reverted to its pre-amendment language. Thus, the current version of Section 10-13.5 again reads "funds."

lenge these funds paid in settlement and financed through general bonds.

B. *Plaintiffs' Trust Beneficiary Standing*

[14] Plaintiffs allege, as an independent basis for standing, that as trust beneficiaries they may sue OHA because OHA receives trust revenues. Although the United States is not an indispensable party to a challenge to the appropriation of *tax* revenue, *see* Part IV.A.2, *supra*, this is not true with respect to OHA's receipt of *trust* revenue. We have previously held that the expenditure of trust revenue is governed by the Admission Act. *Price v. Akaka*, 928 F.2d 824, 827 (9th Cir. 1990). Any challenge to the expenditure of trust revenue brought by alleged trust beneficiaries must challenge the substantive terms of the trust, which are found in the Admission Act. For the reasons we explained in Part III.A.2, *supra,* the United States is an indispensable party to any challenge to the Admission Act. Accordingly, although the United States is not an indispensable party with respect to challenges to OHA's expenditure of *tax* revenue, it remains indispensable with respect to challenges to the expenditure of *trust* revenue.

[15] Plaintiffs' attempt to challenge OHA's expenditure of trust revenue thus suffers from the same fatal flaw as its challenge to the DHHL/HHC lease eligibility requirements. The United States is an indispensable party to the challenge to the expenditure of trust revenue, and yet Plaintiffs cannot establish standing to sue the United States either as taxpayers or as trust beneficiaries. *See* Parts III.A.2 and III.B., *supra*. Plaintiffs therefore cannot proceed with that claim. We do not reach the issue whether Plaintiffs' breach of trust claim is otherwise cognizable under the common law of trusts, which was the basis of the district court's dismissal of the breach of trust claim against OHA. Rather, we affirm the dismissal on the alternative ground that Plaintiffs cannot demonstrate standing to sue an indispensable party.

## V. POLITICAL QUESTION

The remaining question is whether Plaintiffs' surviving cause of action — namely, that the appropriation of state tax revenue to OHA violates the Equal Protection Clause of the Fourteenth Amendment — presents a nonjusticiable political question. The district court reasoned that in order to rule on Plaintiffs' equal protection claims, the court would have to determine what level of scrutiny to apply. *Compare Grutter v. Bollinger*, 539 U.S. 306, 328-33 (2003) (applying strict scrutiny to uphold race-conscious admissions policy at state university law school), *and Gratz v. Bollinger*, 539 U.S. 244, 270-75 (2003) (striking down race-conscious undergraduate admissions policy at state university under strict scrutiny), *with Morton v. Mancari*, 417 U.S. 535 (1974) (applying rational basis, rather than strict scrutiny, to employment preference that benefitted members of Indian tribe because it furthered Indian self-government), *and Alaska Chapter, Associated Gen. Contractors of Am., Inc. v. Pierce*, 694 F.2d 1162 (9th Cir. 1982) (applying rational basis test to native Alaskans based on the federal government's "special obligation" to Indians). The district court reasoned that although Congress has plenary authority over Indian affairs, it "has not yet clearly recognized Hawaiians as being equivalent to Indians or Indian tribes for purposes of the [*Mancari*] analysis." *Arakaki* VI, 305 F. Supp. 2d at 1172. Noting that "Congress has begun to include Hawaiians as beneficiaries in bills providing services to Native Americans" and had pending before it the "Akaka Bill" that would "equate Hawaiians to Indians and/or Indian tribes," the court observed that "Congress is still speaking on the issue." *Id.* at 1173. The district court concluded that Congress "should make the decision as to whether Hawaiians should be treated as Indians for purposes of the [*Mancari*] analysis" and, "in recognition of the continuing debate," the court would "defer[ ] to Congress." *Id.* at 1173, 1174. We hold that these claims do not raise a nonjusticiable political question. We therefore reverse the district court's dismissal on political question grounds, and remand.

Chief Justice Marshall explained in *Marbury* that "[q]uestions, in their nature political, or which are, by the constitution and laws, submitted to the executive, can never be made in this court." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 170 (1803). The Court announced the modern formulation of the political question doctrine in *Baker v. Carr*:

> Prominent on the surface of any case held to involve a political question is found [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

369 U.S. 186, 217 (1962); *see Alperin v. Vatican Bank*, 410 F.3d 532, 537-40 (9th Cir. 2005); *EEOC v. Peabody W. Coal Co.*, 400 F.3d 774, 784 (9th Cir. 2005); *Kahawaiolaa v. Norton*, 386 F.3d 1271, 1275 (9th Cir. 2004), *cert. denied*, 125 S. Ct. 2902 (2005).

**[16]** We have recently addressed the political question doctrine in the context of a challenge to the executive's failure to recognize Hawaiians as federal Indian tribes in *Kahawaiolaa*, 386 F.3d 1271. In that case, native Hawaiians alleged that the Department of Interior had violated the equal protection component of the Fifth Amendment in regulations limiting recognition of new tribes to " 'those American Indian groups indigenous to the continental United States' "—which meant

that "native Hawaiians are excluded from eligibility to petition for tribal recognition under the regulations." *Id.* at 1274 (quoting 25 C.F.R. § 83.3(a)). The district court dismissed the suit against the Department of Interior, in part because matters of tribal recognition raise nonjusticiable political questions. We disagreed with the district court on this point. We noted that "[i]f the question before us were whether a remedy would lie against Congress to compel tribal recognition, the answer would be readily apparent. . . . a suit that sought to direct Congress to federally recognize an Indian tribe would be nonjusticiable as a political question." *Id.* at 1275-76. We found, however, that the plaintiffs did not seek tribal recognition; rather, they wanted the Department of Interior to allow them to apply for recognition "under the same regulatory criteria applied to indigenous peoples in other states." *Id.* at 1276. We concluded that the plaintiffs' suit was not barred by the political question doctrine.

In order to stay our hand in this case, we must determine that the resolution of Plaintiffs' equal protection claims against OHA would interfere with the constitutional duties of one of the political branches, whether that duty has been exercised or not. The district court and the state defendants locate that "textually demonstrable constitutional commitment of the issue" in Article I, Section 8, Clause 3 of the U.S. Constitution: "The Congress shall have Power . . . To regulate Commerce . . . with the Indian Tribes." The Court has observed that "Congress possesses plenary power over Indian affairs, including the power to modify or eliminate tribal rights." *South Dakota v. Yankton Sioux Tribe*, 522 U.S. 329, 343 (1998). Thus, the "questions whether, to what extent, and for what time [Indians] shall be recognized and dealt with as dependent tribes requiring the guardianship and protection of the United States are to be determined by Congress, and not by the courts." *United States v. Sandoval*, 231 U.S. 28, 46 (1913).

Here, no party seeks to *compel* Congress to recognize the tribal status of Hawaiians. Instead, OHA argues that *if* Con-

gress has treated Hawaiians as a tribe, then under the authority of *Mancari*, OHA would have to demonstrate only a rational connection between its Hawaiian preferences and its programs. Plaintiffs argue that Congress' failure, so far, to recognize Hawaiians' tribal status does not *prevent* the courts from deciding whether OHA's Hawaiian-preference violates the Equal Protection Clause of the Fourteenth Amendment. Effectively, the district court found that it could not rule on the equal protection claim until it could determine the appropriate level of scrutiny, and it could not determine the level of scrutiny until Congress decided to grant or not to grant tribal status to Hawaiians.

**[17]** Nothing in the claims Plaintiffs have asserted or the remedy they seek invites the district court to exercise powers reserved to Congress or to the President. The district court has not been asked to declare tribal status where Congress has declined. Instead, it is asked to interpret the implications of past congressional action or inaction for equal protection analysis. Indeed, courts are frequently called upon to "scrutiniz[e] Indian legislation to determine whether it violates . . . equal protection." *Del. Tribal Bus. Comm. v. Weeks*, 430 U.S. 73, 84 (1977). The fact that Congress enjoys "plenary power . . . in matters of Indian affairs 'does not mean that all federal legislation concerning Indians is . . . immune from judicial scrutiny.' " *Id.* at 83-84 (quoting Brief of the Secretary of the Interior). In general, "the political question doctrine does not bar adjudication of a facial constitutional challenge even though Congress has plenary authority, and the executive has broad delegation, over Indian affairs." *Kahawaiolaa*, 386 F.3d at 1276.

In the exercise of its power to regulate commerce with Indians and recognize their sovereign status, Congress might be able to alter the relative burdens of proof and persuasion shouldered by Plaintiffs and OHA in this case.[5] But Congress

---

[5]We couch this in the conditional because the Court in *Rice* suggested that it remains "a matter of some dispute . . . whether Congress may treat

has no obligation to exercise its Article I, Section 8, Clause 3 powers in any particular way. That it has, so far, declined to do so does not excuse the district court from hearing the case. Congress does not have a constitutionally committed power to set the level of scrutiny for those claiming native American status; it has the constitutionally committed authority to regulate affairs with native Americans, and the courts then determine which level of scrutiny is warranted by Congress' action or inaction. *See, e.g., Three Affiliated Tribes of Fort Berthold Reservation v. Wold Eng'g*, 476 U.S. 877, 882 (1986); *United States v. Antelope*, 430 U.S. 641, 645-46 *(1977); Mancari*, 417 U.S. at 553 n.24.

Moreover, we note that even if Congress had treated Hawaiians or native Hawaiians as a tribe, the district court would still have to determine whether OHA's classification was based on race or on tribal status. As we observed in *Kahawaiolaa*:

> As *Rice* illustrates, an "Indian tribe" may be classified as a "racial group" in particular instances . . . . We reject the notion that distinctions based on Indian or tribal status can never be racial classifications subject to strict scrutiny. . . . Government discrimination against Indians based on race or national origin and not on membership or non-membership in tribal groups can be race discrimination subject to strict scrutiny.

386 F.3d at 1279 (citing *Adarand Constructors v. Pena*, 515 U.S. 200, 227 (1995)). This, too, is a determination properly left to the courts. *Id.*

---

the native Hawaiians as it does the Indian tribes." 528 U.S. at 518. Like the Court, "[w]e can stay far off that difficult terrain" in this appeal. *Id.* at 519.

**[18]** The questions on which Plaintiffs have standing squarely and exclusively raise a Fourteenth Amendment claim. The courts must therefore determine the proper level of scrutiny. We do not require further action by Congress to inform that determination. To deny the federal courts their authority to adjudicate an equal protection claim simply because Congress expressed its intent with less than complete lucidity is to expand the political question doctrine beyond its historical limits. In doing so, it would restrict judicial authority in unprecedented ways; such an expansive interpretation subverts the very separation of powers that the political question doctrine is designed to protect. Although the Supreme Court was able to postpone consideration of those equal protection questions of "considerable moment and difficulty," *Rice*, 528 U.S. at 518-19, we do not have that luxury. We therefore remand to the district court the issue whether the expenditure of state tax revenue on OHA programs violates the Equal Protection Clause of the Fourteenth Amendment.

## VI.   PLAINTIFFS' REMAINING MISCELLANEOUS ARGUMENTS

Plaintiffs make several additional arguments on appeal, none of which is meritorious. Plaintiffs contend that the district court erred in striking its Counter Motion for Summary Judgment of December 15, 2003. The district court cited multiple grounds in its December 16, 2003 unpublished Order for striking the motion, including: the motion was not a true counter motion because it raised numerous issues not raised in the motion which it purportedly countered; it was untimely; and the motion was not filed in the proper round of summary judgment rounds, as scheduled by the district court in a previous order.

**[19]** We review for abuse of discretion challenges to pretrial management. *Navellier v. Sletten*, 262 F.3d 923, 941 (9th Cir. 2001). "The district court is given broad discretion in supervising the pretrial phase of litigation." *Johnson v. Mam-*

*moth Recreations, Inc.*, 975 F.2d 604, 607 (9th Cir. 1992) (citation and internal quotation marks omitted). Plaintiffs have not demonstrated that the district court's management of the summary judgment phase of this trial constituted an abuse of discretion. The district court's December 16, 2003 Order is affirmed. Similarly, we are unpersuaded by Plaintiffs' contention that the district court's pretrial management warrants the reassignment of this case to another judge and their request is denied.

**[20]** Plaintiffs also appeal the district court's May 5, 2004 unpublished Order awarding roughly $5300 in costs to select defendants on the ground that imposing such costs will have a "chilling effect" on civil rights litigation. We review an award of costs for abuse of discretion. *Evanow v. M/V Neptune*, 163 F.3d 1108, 1113 (9th Cir. 1998). Plaintiffs have not demonstrated that the award of such modest costs, divided among multiple plaintiffs, constitutes an abuse of discretion. The district court's May 5, 2004 Order is affirmed.

**[21]** Finally, Plaintiffs seek reversal of the district court's January 26, 2004 unpublished Order denying Plaintiffs' motion to compel discovery. A district court's discovery rulings are reviewed for an abuse of discretion. *United States v. Fisher*, 137 F.3d 1158, 1165 (9th Cir. 1998). Again, we find no abuse of discretion, and the order is affirmed.

## VII.   CONCLUSION

The district court's orders are variously affirmed or reversed as follows.

*Arakaki* I, 198 F. Supp. 2d 1165 (D. Haw. 2002), is affirmed in part and reversed in part. We affirm the court's holding that Plaintiffs have standing to challenge the appropriation of state tax revenue to OHA. We reverse the holding that Plantiffs have standing as taxpayers to challenge the appropriation of tax revenue to DHHL/HHC. We affirm the

denial of standing to challenge the settlement of past claims against OHA. We affirm the denial of standing to challenge the issuance of bonds and the denial of standing to challenge all other spending that does not originate in tax revenue. The remaining issues addressed in that order are not on appeal.

*Arakaki* II, 299 F. Supp. 2d 1090 (D. Haw. 2002), is affirmed in part and reversed in part. We affirm Plaintiffs' standing to challenge the appropriation of state tax revenue to the OHA. We reverse the grant of standing to challenge the appropriation of tax revenue to DHHL/HHC. We affirm the denial of standing to sue as trust beneficiaries. We affirm the denial of the motion to dismiss the tax revenue claim against OHA under the political question doctrine. We reverse the denial of the motion to dismiss the tax revenue claim against DHHL/HHC. The remaining issues in that order are not on appeal.

*Arakaki* III, 299 F. Supp. 2d 1107 (D. Haw. 2002), is affirmed on different grounds. *Arakaki* IV, 299 F. Supp. 2d 1114 (D. Haw. 2003), and *Arakaki* V, 299 F. Supp. 2d 1129 (D. Haw. 2003), are affirmed. *Arakaki* VI, 305 F. Supp. 2d 1161 (D. Haw. 2004), is reversed. All remaining orders in this case are affirmed.

The parties shall bear their own costs on appeal.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**